WALTER H. CAMP, as Trustee under the Last Will and Testament of MARIETTA P. HAY, Deceased, Plaintiff, *v.* THE PRESBYTERIAN SOCIETY OF SACKETS HARBOR et al., Defendants.

(Supreme Court, Jefferson Equity Term, November, 1918.)

Wills — bequests of certain corporate stocks in trust for charitable purposes — trustees authorized to use accumulated income under the exercise of the cy pres power.

Testatrix having constructed a church tower and installed a chime of bells therein, and being desirous of placing a library of books and curios therein and to make provision for the same by her will, procured from the church society an agreement which, after reciting the facts, provided that the tower and land upon which it stood and the contents thereof should never be sold or incumbered but that it should be kept solely for the purposes aforesaid. By her will she bequeathed certain corporate stock in trust forever, the yearly income of which was to be used for the purchase of new books and works of art for said library and the care of same and for no other purpose whatsoever. A similar bequest of other corporate

stock to the same trustees directed the yearly income thereof to be used to keep the tower and bells in good condition and aid in the ringing of the bells. Soon after the death of testatrix and owing to changed conditions it became evident that the income of the trust for the purchase of books and works of art and for the care of the same was entirely indequate, while with the advent of the European war the corpus of the other trust fund rose abnormally in value and the trustees regarding the income from all the trust estate as a single fund, paid janitor service and salaries of librarian and from time to time purchased books for the library until no further purchases could be made because of want of room to keep the books. In an action for the construction of the trust clause of the will brought by the trustee in whose hands there had incidentally accumulated a surplus of income arising from the corpus of the second trust fund *held:*

The provision of said trust clause was valid as a gift to charitable uses and that under the exercise of the *cy pres* power the court would authorize the trustee to use said accumulated income for the uses of the library and for the purpose of enlarging and rebuilding the tower so as to afford suitable rooms for the library.

Permission of the church society should first be obtained to make the needed improvements and its contract with testatrix extended so as to cover such enlargements, and before proceeding with the work the trustee should submit to the court for its approval a proposed plan of the contemplated improvement with leave, at the foot of the decree, to apply for further instructions.

ACTION to construe a will.

Cobb & Cosgrove, for plaintiff.

Davison & Given, for defendant Tarrytown Historical Society.

William De Graff, for defendant Amy Beach Ewers.

EMERSON, J.  The plaintiff is a substituted trustee under the last will and testament of one Marietta P.

Hay, deceased, and brings this action for the construction of a trust clause contained in her will, and for the direction of the court as to carrying out said trust.

The testatrix died on May 15, 1901, leaving a last will and testament which was thereafter duly probated, and which contained among other things the following provision:

"I give unto Allen C. Beach of Watertown New York, and Walter B. Camp of Sackets Harbor, New York, or the survivors or successors of them, In trust one hundred shares of American Bank Note Company Stock, Also twenty seven shares of New York Central and Hudson River R. R. Company Stock, to be held in trust forever, The income and Interest each year, be used for the purchase of new Books works of Art for the Pickering and White Library in Chime Tower and care of the same, and for no other purpose whatsoever. Also thirty-nine shares of New Jersey Zinc Company Stock the income each year to be used to keep Chime Tower, and Bells in good condition and aid in playing said Bells at Sackets Harbor, New York."

Allen C. Beach, who was named as one of the trustees, declined to serve as such trustee, and Walter B. Camp, the remaining trustee, having resigned, the plaintiff was duly appointed by the court as such substituted trustee on May 11, 1907, and duly qualified as such.

The evidence in the case shows that the trustee now has a large fund on hand arising from a surplus income of the trust estate. While the amount expended for the upkeep of the library has been less than $2,000 per year, the annual income from the American Bank Note Company stock and the New York Central stock mentioned in the will has been about $735 per year, and the annual income from the New Jersey Zinc Company stock therein mentioned is over $10,000. The trustee

now has on hand a surplus income thus arising from said New Jersey Zinc Company stock of about $40,000, and he now asks the court to determine whether he has power under the will to use such surplus for library purposes.

To determine this question we must first consider the existent circumstances which surrounded the testatrix and which manifestly impelled her to make this provision. She resided at Tarrytown at the time of her decease and it is fairly inferable from the evidence that she was a person of large means. She was a native of Sackets Harbor and her early years were spent in that village. She entertained a kindly memory of the home of her childhood and had a desire to do something that would be of benefit to that community. With this idea in view she had, prior to the year 1900, installed a chime of bells in the tower of the Presbyterian church. This church was burned down later and when it was rebuilt in the latter year the testatrix herself constructed a church tower in connection therewith in which she installed a new chime of bells. She also conceived the idea of establishing a public library in connection with such tower and chimes and had the same constructed with special reference to such uses. Having thus built the tower and installed the bells, she procured from the church society on November 12, 1900, an agreement which after reciting that she had constructed the tower and installed a chime of bells and was desirous of further placing a library of books and curios therein and to make provision for the same in her will, provided that the tower and land on which it stood and the contents thereof should never be sold or incumbered, but that it should be kept solely for the purposes aforesaid. Following the execution of this agreement and on December 27, 1900, she executed the will in question naming the benefaction she thus pro-

posed to create the Pickering and White Library in Chime Tower, and for its establishment and upkeep she created the trust in question.

In the next place it is well to consider the changed conditions that have resulted since the making of the will and the death of the testatrix. It soon became evident that the income of the trust fund which the testatrix directed should be used solely for the purchase of books and works of art and the care of same, was entirely inadequate for that purpose, as such income only amounted to $735 a year, and janitor service and salary of librarian alone amounted to nearly $900, while the 39 shares of zinc stock which the testatrix directed should be held by the trustees and the income used to keep the tower and chimes in good condition and pay for playing the same, with the advent of the European war rose most abnormally in value, so that in 1915 a stock dividend of 250 per cent was declared, making the total holding of the trustees 136½ shares. This one-half share was disposed of and the balance of 136 shares retained in the trust fund, and in the year 1916 produced a dividend of 76 per cent on the whole 136 shares or total dividends thereon for that year of $10,336, and in the year 1917 produced dividends to amount of 45 per cent, or $6,256 in all. The trustee seems to have regarded the income from all the trust estate as a single fund, and from the same has paid janitor service and salaries of librarians, and has also purchased books for the library from time to time until no further purchases could be made on account of want of room in which to keep the same.

With the growth of the library it has been found that the rooms now provided in the tower are utterly inadequate for the purpose intended. The rooms are small and of insufficient seating capacity; there is a complete congestion for want of room in which to

locate the necessary book cases, and access to the library floors is only obtained by means of a spiral stairway so narrow that persons cannot meet and pass on the stairs, and which is so constructed that it is with the greatest difficulty that many elderly persons can reach the library. It is very apparent that if the scheme the testatrix had in mind is to be carried out the library facilities must be improved, either by purchasing or erecting a separate building, or by rebuilding the present tower so as to afford ample room for that purpose. With this necessity in view the trustee now asks the court to construe the clause in question and to determine the right of the trustee to use the surplus income from the zinc stock for the purchase of books for the library and for improvements in the housing of the same. I do not think the trustee has power to purchase or construct a separate building, as this would be clearly foreign to the intention of the testatrix, which was to provide a church tower and in that tower place a chime of bells and a public library, so that it seems to me his power is limited to an enlargement or reconstruction of the tower itself so as to accomplish the above purpose. The vital question is thus presented whether he may use the accumulated surplus for that purpose. It is quite clear that such use is not authorized by the strict terms of the will, because the language of the trust is that the income from the zinc stock is to be used to keep the chime tower and bells in good condition and aid in playing the bells. This would hardly authorize the use of the income to buy books for the library and to reconstruct the tower building. If then the trustees are given that power it must be obtained through the application of the doctrine of charitable uses. A charitable use imports a gift for the benefit of the general public. It includes all gifts in trust for religious

and educational purposes and for the public benefit, convenience, utility or comfort, and the only limitation seems to be that it must be for some public benefit open to an indefinite or vague number of persons. In such cases it is immaterial that the trustee is uncertain or the object of the charity indefinite, for in applying the rule the court is merely giving effect to the presumed intention of the testator. In enforcing this doctrine it considers that, having devoted the fund to charity, if for any reason the particular charity mentioned cannot be carried out, the court will select some kindred charity, as it cannot be presumed the testator meant the charity to fail because changed conditions have made it impossible to carry out literally the express wishes of the testator. Tiffany & Bullard Trusts & Trustees, 232, 236; 2 Perry Trusts (6th ed.), §§ 687, 710.

This selection of a subject for the charity of the testator is called the exercise of the *cy pres* power of the court, which means that the court in applying the charity proceeds as nearly to the expressed intention of the testator as possible. This *cy pres* power constitutes the peculiar feature of the English system of dealing with charities and is executed in determining gifts where the donor has failed to define them and in framing schemes of approximation to the donor's design. It is merely a liberal rule of construction to ascertain the intention of the donor as it is the object of the law to ascertain and carry out such intention. 2 Perry Trusts (6th ed.), §§ 723, 726.

It proceeds upon the principle that it is the duty of the court to give effect to the general intention of the testator. If the particular mode of executing the charity fails, the court will apply one rather than permit the general charitable purpose to fall, so when a literal execution of the trust becomes inexpedient or

Supreme Court, November, 1918.   [Vol. 105.

impracticable the court will, in the exercise of this *cy pres* power, execute it as nearly as it can according to the original purpose.   Tiffany & Bullard Trusts, 241, 242, 243, 251.

But when the purpose of the charity fails and there are no objects to which to apply the funds, the court must determine whether the charitable intention of the testator has come to an end and the fund must revert to the heirs or personal representatives, or whether there was a probable intention on the part of the donor that the gift should be applied *cy pres* the original purpose.   If, therefore, it appears that the testator had a particular object in view and none other, and that purpose cannot be accomplished, the charity must fail and the next of kin will take.   2 Perry Trusts (6th ed.), §§ 723, 724, 725, 726; Tiffany & Bullard Trusts, 244, 247; *Corbyn* v. *French,* 4 Ves., Jr., 418, 433, and note; *Attorney-General* v. *Pyle,* 1 Atk. 435.

In the case of *Utica Trust & Deposit Co.* v. *Thompson,* 87 Misc. Rep. 37, I had occasion to speak of the rise and development of the law of charitable uses and said that its purpose was to abrogate the strict rule of the common law which condemned trusts, unless the beneficiaries were so named or identified that they had a standing in court to enforce the trust. That it had an existence in England as early as the Norman conquest and continued down to the time of the American Revolution.   In such cases the Court of Chancery upon motion of the attorney-general or interested parties, assumed jurisdiction of the trust and directed a distribution of the charity as nearly as possible in accordance with the wishes of the donor.   To that end a master would be appointed to devise a scheme for such administration and thus was brought into operation what was known as the *cy pres* doctrine, whereby the administration of the

charity was carried out with as close approximation to the scheme of the testator as was reasonably practicable. It was long a disputed question in our courts whether the doctrine of charitable uses was ever engrafted into the jurisprudence of our state. Judges of great ability differed upon the question and several conflicting decisions seem to have been made upon the subject, until finally it was held in *Holmes* v. *Mead,* 52 N. Y. 332, that the English doctrine of charitable uses as known in England prior to the American Revolution had no place in our law. This continued the unquestioned law of the state down to the enactment of the Charitable Uses Act of 1893. This act is chapter 701 of the Laws of that year, and provides that no gift, grant, bequest or devise to religious, educational, charitable or benevolent uses in other respects valid shall be deemed invalid because of the indefiniteness or uncertainty of the persons designated as beneficiaries thereunder in the instrument creating the same. That if a trustee was named the legal title should vest in such trustee, otherwise in the Supreme Court, and that the Supreme Court should have control over all gifts, grants and bequests of the kind above enumerated, and that the attorney-general should represent the beneficiaries in all such cases, whose duty it should be to enforce such trusts by proper proceedings in court. This statute was amended by chapter 281 of the Laws of 1901 so as to provide that whenever it should appear to the court that circumstances had so changed since the execution of an instrument containing a gift, grant or bequest to religious, educational, charitable or benevolent uses as to render impracticable or impossible a literal compliance with the terms of such instrument, the court might, upon application of the trustee or of the person or corporation having custody of the property, make

an order directing that such gift, grant or bequest be administered or expended in such manner as in the judgment of the court would most effectually accomplish the general purpose of the instrument without regard to and free from any specific restriction, limitation or direction contained therein, and as thus amended re-enacted by section 12 of the Personal Property Law. The effect of this statute is to restore the ancient doctrine of charitable uses together with the *cy pres* power of the court. *Allen* v. *Stevens,* 161 N. Y. 122; *Matter of Griffin,* 167 id. 80, 81; *Bowman* v. *Domestic & Foreign M. Society,* 182 id. 494, 498; *Matter of Shattuck,* 193 id. 446; *Matter of Cunningham,* 206 id. 601, 607; *Matter of MacDowell,* 217 id. 454, 460.

The ancient doctrine of charitable uses, together with the concomitant *cy pres* power of the court, being now the settled law of the state, I cannot see why it should not be applied in this case. There is a surplus income from the trust fund over and above what the will specially directs to be expended, and the court, in the exercise of its *cy pres* power, must determine what disposition should be made of the surplus, having regard to the probable intention of the testatrix. While the ancient practice was to refer the matter to a master to report a scheme to which the fund should be applied, the court can upon the evidence determine that fact unaided by a referee. *Allen* v. *Stevens,* 161 N. Y. 123, 142.

It is quite true that the will provides for two distinct funds and in a sense refers to two separate trusts, but they are each part of one single scheme in the mind of the testatrix, which was to provide for the care of the tower she had erected, secure the ringing of the bells, and establish and maintain a free public library therein. It is not supposable that having thus

constructed a tower and established a library therein, she ever intended to leave the same unprovided for. To this end she made the Library Chime Tower and Bells, one of her residuary legatees, a bequest which, however, has been held void on account of want of legal capacity to take. As a result, unless this fund is applied to library purposes, the same will be utterly unprovided for and this scheme of public utility and education the testatrix had in mind must necessarily fail. That the subject involves a charitable use does not admit of any question, as it relates to a public utility and education and is solely for the public benefit. *Matter of Shattuck,* 193 N. Y. 446; *Matter of Robinson,* 203 id. 380.

That it also comes well within the *cy pres* power of the court would seem to be clear, for by reference to the adjudged cases we will find many instances where this power has been exercised in quite similar cases. A collation of some of the authorities upon this point may be found quite useful. A most instructive case is that of *Attorney-General* v. *Dean & Canons of Windsor,* 24 Beav. 679; 5 H. L. Rep. 369. The case involved the disposition of surplus income from lands granted by Edward VI for the support of the dean and canons and poor knights of Windsor. Henry VIII in his will had directed that certain crown lands should be conveyed to the dean and canons of Windsor of the yearly value of £600 for the purpose of saying masses over his tomb and to furnish alms for the poor and support for the poor knights of Windsor. His son and successor, Edward VI, accordingly made such a conveyance, the grantees covenanting to employ £600 of the income yearly in such manner as might be prescribed by the crown. His successor, Queen Elizabeth, nominated the poor knights of Windsor and determined the amount of income they should

receive, the remainder of the £600 to be applied to the vicars and serving priests, wages, officers' fees and the relief of the dean and canons and their successors.  A surplus of income having arisen, the poor knights claimed to participate in its division, while the dean and canons claimed to be entitled to the same after making the fixed payments directed.  Upon an information filed by the attorney-general to determine the matter of distribution of this surplus, the master of the rolls, Sir John Romilly, held the dean and canons were entitled to the whole surplus, as it was a conveyance to them of certain property charged with certain payments.  This decree was finally affirmed in the House of Lords and, while the application of the *cy pres* rule was denied in that case, much was said by the learned judges on the subject and all seem to agree that such a rule would have been applied except for the fact that under the conveyance the dean and canons became the owners of the whole income except the £600 they had covenanted to pay.

In *Attorney-General* v. *Corporation of Beverly,* 15 Beav. 540, Sir John Romilly, master of the rolls, again said that the rule of division of increased rents of charity estates was that where an estate was given with a direction for the donee to pay out of the rents certain payments, the donee took the whole beneficial interest subject to such payments.  But if the donee was to take from the rents a specified sum for his services, then the different charitable objects all participated in the increased rentals according to the amount originally given them.

In *Attorney-General* v. *Minshull,* 4 Ves. Jr. 12, the testator left his property in trust, the income to be used, forty shillings yearly in buying coats for poor men and women in the parish whom the trustees thought proper objects of charity, and that the residue

of such income, after payments of certain sums to the trustees for services and expenses, should be applied towards placing out poor children as apprentices at an expense not to exceed ten pounds for each child. It was found that the poor children could not be so placed for that sum and a surplus of income arose. The heirs at law claimed the surplus, but it was held that the testator intended the whole income devoted to charity and the claim of the heirs was, therefore, denied and the fund was applied by the court to other charitable purposes *cy pres* the intention of the testator.

The case of *Attorney-General* v. *Iron Mongers Co.*, 2 My. & K. 576; 2 Beav. 313, is a most instructive authority upon the subject and would seem to be directly in point. In that case the testator bequeathed all of his estate to defendant in trust to apply one-half the income yearly to the redemption of the British slaves in Turkey and Barbary and the remaining half to other charities. There were no slaves in Turkey or Barbary to be redeemed and, a large surplus of income having arisen for this reason, Sir John Leach, master of the rolls, held that the court had no power to apply it to the other charities mentioned in the will, which had not failed, but upon appeal the lord chancellor, Lord Brougham, held differently and directed the surplus to be applied through the exercise of the *cy pres* power of the court. The lord chancellor said that the character of charities was impressed on the whole fund and there was good sense in presuming that had the testator known an object was to fail he would have given its appropriated fund to the increase of the funds which he directed to be paid to the other charities mentioned in the will. This, the lord chancellor said, was the foundation of the *cy pres* doctrine.

*Attorney-General* v. *Marchant*, 3 Eq. Cas. (L. R.)

Supreme Court, November, 1918.          [Vol. 105.

424, decided in 1886, is also quite in point. In that case a testator by his will made in 1640 devised his real estate to trustees in trust to devote the income thereof to certain charitable uses, the will specifying the amount each charity should receive, which constituted all the income the property would then produce, and the income having thereafter largely increased through lapse of time, on an information filed by the attorney-general, asking the direction of the Court of Chancery as to the disposition of this increase, it was held that the *cy pres* doctrine should be applied and the fund distributed among such other charities mentioned in the will as were thought most deserving.

Again, in *Jackson* v. *Phillips,* 14 Allen, 539, where a bequest had been made to trustees to be expended in circulating literature to create public sentiment against negro slavery, and afterwards slavery was abolished so that there were no objects specially designated in the will to which the charity could attach, the court denied the claim of the heirs that the fund reverted to the estate. The court construed the will as showing an intention on the part of the testator to establish a permanent charity for the benefit of the colored race and that it was his intention, in case the special purpose named in the will should fail, to apply the fund to the nearest similar use. The court, therefore, under the exercise of the *cy pres* power, sent the matter to a master to devise a scheme for that purpose, which was afterwards approved and the fund so applied.

Coming now to our own state, it will be found that the exercise of the *cy pres* power has been upheld by the courts since the enactment of the Charitable Uses Act in 1893, and especially since the amendment of 1901, which specially conferred such power on the court where conditions had changed since the making

of the will.   Pers. Prop. Law, § 12; *Allen* v. *Stevens,*
161 N. Y. 122; *Matter of Brundage,* 101 Misc. Rep.
538, 539; *Trustees of Sailors Snug Harbor* v. *Carmody,*
211 N. Y. 286; *Matter of MacDowell,* 217 id. 455.
See also the following cases where the doctrine of
charitable uses has been upheld and applied by our
courts: *Matter of Rasquin,* 159 App. Div. 845; *Matter
of Norton,* 165 id. 787; *Matter of Groot,* 173 id. 436;
*Torrey* v. *Day,* 81 Misc. Rep. 40; *Matter of Shattuck,*
193 N. Y. 446; *Matter of Robinson,* 203 id. 380; *Matter
of Cunningham,* 206 id. 601.

It is, however, urged on behalf of the residuary
legatees that the fund in question constitutes an unlaw-
ful accumulation and, therefore, falls into the residuary
estate.   I do not so understand the case.   The will
contains no direction for such accumulation and it
merely results incidentally from the administration
of the trust.   The rule condemning such accumula-
tions only maintains where the will expressly or
impliedly authorizes the same.   *Livingston* v. *Tucker,*
107 N. Y. 549; *Matter of Stevens,* 46 Misc. Rep. 623;
*Hill* v. *Guaranty Trust Co.,* 163 App. Div. 374, 376;
*Matter of Bavier,* 164 id. 359; *Matter of Langdon,* 89
Misc. Rep. 333.

*Matter of Kohler,* 96 Misc. Rep. 435–442, is not
applicable, as in that case only a certain amount of
increase was to be paid to the beneficiary and the
balance was undisposed of by the will, while here the
trustees take the whole income of the trust estate for
the purposes mentioned in the trust.   It follows, there-
fore, that as the bequest is valid and has not lapsed,
the residuary legatees have no standing in court to
claim the accumulated income.   *Matter of Norton,*
165 App. Div. 787, 789; *Stewart* v. *Franchetti,* 167
id. 541, 547; *Matter of Groot,* 173 id. 436.

My conclusion is that the provisions of the will in

question may be sustained as a valid gift to charitable uses, and that under the exercise of the *cy pres* power the trustee may be authorized to use the accumulated income from the New Jersey Zinc Company stock for the uses of the Pickering and White Library mentioned in the will of the testatrix, and for the purpose of enlarging and rebuilding the Chime Tower therein mentioned so as to afford suitable rooms for such library.

The trustee should first obtain the permission of the Presbyterian Society of Sackets Harbor to make such improvements and also extending the provisions of the contract of November 12, 1900, to such tower enlargement, and he should submit to the court the proposed plan for approval before proceeding with the work, with leave to apply to the court at any time at the foot of the decree for further instructions on the premises.

A decree accordingly should be made and, to that end, findings in accordance with this opinion may be prepared and settled before me on five days' notice. All questions as to allowance of costs are reserved until settlement of the findings.

The plaintiff's attorneys will serve a copy of this opinion with the proposed findings.

Judgment accordingly.