OPINION OF THE COURT
John S. Lockman, J.
The issues to be determined in this action are threefold, whether changed circumstances have rendered "impracticable or impossible” literal compliance with a deed of gift dating *1057 back to 1885, whether the donor exhibited a general charitable intent susceptible of cy pres relief, and if so, what manner of modification will "most effectively accomplish” the general purpose of the donor (see, EPTL 8-1.1 [c] [1]).
The petitioner, Attorney-General Robert Abrams, instituted this proceeding pursuant to the authority and duty imposed under EPTL 8-1.1 (f) to enforce a charitable trust (see, Alco Gravure v Knapp Found., 64 NY2d 458). The respondent, Chapter of the Cathedral of the Incarnation in the Diocese of Long Island (hereinafter the Chapter), is the charitable beneficiary of the good will and philanthropic generosity of Cornelia Stewart of Garden City who, by various testamentary and inter vivas gifts, established and firmly rooted the spiritual center of the Episcopal Church on Long Island in Garden City. As part of the trust gifts, in part intended to honor her late husband Alexander, she established two schools, one for boys —St. Paul’s and the other for girls, St. Mary’s — both intended to be run in the English tradition. In 1990 the two schools were merged at the campus at St. Paul’s due to declining enrollments and financial deficits. It appears that the Chapter intended to generate additional funds by leasing a building on the campus, thus reducing the huge deficits incurred by the schools prior to the merger. However, no lease was possible due to zoning restrictions, and the Cathedral announced the closing of the merged school in March of 1991. The Attorney-General now seeks a cy pres determination.
At a hearing as directed by order dated June 19, 1991, the issues to be determined were expanded from those preliminarily directed. Thus, the hearing to determine whether the Cathedral is financially able to continue operation of the school evolved to one giving full consideration to the ultimate cy pres issues. The facts as determined by the court are outlined below.
The Journal of Proceedings of the Nineteenth Convention of the Protestant Episcopal Church in the Diocese of Long Island, held in May of 1885, indicates that the lower forms of the "Cathedral Schools, Garden City” were in operation for eight years before Cornelia Stewart’s gift. St. Paul’s had 53 students and St. Mary’s 44. Of the gift of land and buildings it was stated, "In concluding our reports of the work of the several schools under our supervision, we would emphasize the fact that now * * * we are enabled to make our appeal for the support of the Diocesan Schools, giving you the guarantee of good faith on our part in their future ministration and *1058 maintenance. Especially is this true of the St. Paul’s School at Garden City. All uncertainty as to its future use is now removed. The building, second to none of its kind in the world, admirably furnished and thoroughly equipped for its work, is ours today in fee simple * * * The Trustees of the Cathedral fully realize the importance and the magnitude of the work of maintaining successfully this great school, and by Committee and as a body have given themselves heartily and unreservedly to the work * * * We cannot too much emphasize the fact that the success of St. Paul’s School is the pivotal point about which, for the present, Cathedral work must turn.”
The New York Times of August 4, 1876 reports that the construction at St. Paul’s was "part of a system of colleges devised by the late A.T. Stewart years ago and afterward carefully arranged in detail and matured by himself, his widow and his successor in business”. Judge Hilton, Cornelia Stewart’s trustee, remarked: "Whatever forms of charity or philanthropy I consider useless, or even pernicious, there are two which I have absolute faith in, and which I believe it is every man’s duty to help. I believe in hospitals * * * I believe in schools * * * Of all Mr. Stewart’s philanthropic plans, I have most faith in the Garden City school system”.
A later article in the New York Times of May 26, 1879 goes so far as to state that although the magnificent Cathedral containing the crypt for the Stewart family is "the architectural monument of the place”, nevertheless, all the improvements "are to be, according to the design, only the surroundings of the great feature of the city — the college system. It is intended to make Garden City the American Oxford and an Episcopalian Church centre”.
Thus, the circumstances surrounding the gift indicate that St. Paul’s School (and by inference St. Mary’s) was central, and as important to the Stewarts as the Cathedral itself. St. Paul’s was the "pivotal center” for the work of the Cathedral; St. Paul’s was "carefully arranged in detail” by Alexander Stewart, and St. Paul’s was intended to be the "great feature” of Garden City. The facts refute and the court rejects any contention by respondent that the Cathedral Schools were of secondary importance in the Stewart legacy. Indeed, where the will details the trust for the Protestant Episcopal Church, the school is the first mentioned. "The school building to be used for school purposes and as a school attached to such Cathedral. The See House to be used as the residence of the Bishop of said Diocese and not otherwise and the lands and *1059 premises to be forever held, occupied and enjoyed by the [grantee], but without power, right, or authority to grant, convey, lease or mortgage the same in any way or manner whatsoever.” Given the foregoing, the wishes of Cornelia Stewart regarding a school must be carried out, so long as there are a reasonable number of students desiring a Christian education. A dormitory with a chaplain living on the premises, the prospective use of St. Paul’s advocated by respondent, cannot qualify standing alone. A dormitory is an adjunct to a school — it is not a school. It is simply not a place of learning. Respondent cannot alter the purpose of a dormitory by providing a chaplain.
Having determined the nature of the donor’s intent, and having concluded that her general purpose was to permanently endow Garden City and the Episcopal Church with a school, the court now turns to the issue of whether it has become impracticable or impossible to continue the merged school with restrictions as recited in the deed conveying St. Paul’s.
Only after accumulated operating and capital debt reached $4Vá million did the Chapter announce the closing of St. Mary’s/St. Paul’s in March of 1991. The school had incurred significant operating deficits of approximately $1 million each year since 1988-1989. The proposed solution for deficit reduction had failed, i.e., the lease of one of the buildings on the St. Mary’s campus to the Episcopal Health Services as an office building. This "endowment” for the school’s future conflicted with zoning restrictions. Moreover, the community was opposed. However, the Chapter’s commitment to finding an alternate solution with active recruiting and fund raising appears to have been in conflict with other interests. A full four months before announcing the school’s closing, the Chapter was engaged in preliminary negotiations to lease St. Paul’s to Adelphi University to be used as a dormitory, with a tentative figure of $2 Vi million discussed. The evidence concerning operating deficits, notwithstanding that the Chapter did not undertake complete, concerted and committed efforts at fund raising and recruitment, persuades the court that the test of changed circumstances has been met, and that the merged school cannot be operated without lifting restrictions which prohibit leasing. Thus, the goal is to allow leasing and continue the school, a solution which "most nearly” effectuates Cornelia Stewart’s intent, and a solution which is viable if the merged school operates at the St. Mary’s campus *1060 instead of St. Paul’s. With such a resolution, the Chapter is free to enter a long-term lease of St. Paul’s to Adelphi, or make some other profitable use of this incredibly beautiful edifice.
The law to be applied to the foregoing facts addresses three distinct areas — the general law of cy pres, specific issues before the court and the extent of the court’s power to deal or resolve those issues.
Historically, the "common-law cy pres doctrine, or 'ancient doctrine of approximation’ * * * embodies the English concept that when a donor parts with * * * property for a charitable purpose it shall be forever devoted to that purpose, whether or not the particular donee continues to exist” (Matter of Multiple Sclerosis Serv. Org., 68 NY2d 32, 41). The concern of the common law was disposition of gifts when the charitable donee could no longer administer the trust assumed. The Anglo-French words, cy pres, translated literally mean "as near as possible” and that was the object of the court, to continue the gift as near as possible (Matter of Multiple Sclerosis Serv. Org., supra). However, New York’s highest court has held that the common-law doctrine does not prevail in New York (Tilden v Green, 130 NY 29), and thus a statute, which has been in effect for over 50 years, governs the issues before this court, and we are not concerned with giving effect to the common law or "particular purpose” of the donor "as near as possible” (Matter of Multiple Sclerosis Serv. Org., supra, at 42-43).
EPTL 8-1.1 (c) (1) provides in relevant part: "whenever it appears * * * that circumstances have so changed since the execution of an instrument making a disposition for religious, charitable, educational or benevolent purposes as to render impracticable or impossible a literal compliance with the terms of such disposition, the court may * * * make an order or decree directing that such disposition be administered and applied in such manner as in the judgment of the court will most effectively accomplish its general purposes, free from any specific restriction, limitation or direction contained therein”. (Emphasis added.) Thus, by statute, the court’s task is to determine whether changed circumstances have rendered it impracticable or impossible to strictly carry out the donor’s intent, and how to "most effectively accomplish” the general purpose of the donor. It is noted here that the court’s duty is not to establish how to effectively accomplish but how to "most” effectively accomplish the donor’s general intent. "In *1061 reforming trusts pursuant to this power, care must be taken to evaluate the precise purpose or direction of the testator, so that * * * the court * * * will 'give effect insofar as practicable to the full design of the testator as manifested by [the] will and codicil’ ” (Matter of Wilson, 59 NY2d 461, 472, quoting Matter of Scott, 8 NY2d 419, 427; emphasis supplied). "[0]f course [the court] cannot invoke its cy pres power without first determining that the testator’s specific charitable purpose is no longer capable of being performed by the trust” (Matter of Wilson, supra, at 472), but the "troublesome question [is] deciding in what manner [cy pres] powers should be exercised” (Matter of Wilson, 87 AD2d 98, 101). The first step, of course, is to determine the donor’s purpose, and whether it can be considered "general” and capable of cy pres relief. When considering "the existent circumstances which surrounded the testatrix and which manifestly impelled her” to make the gift, it is clear that Cornelia Stewart had a general charitable intent which is capable of cy pres relief, and the lack of a "gift over” is further evidence of such general charitable intent (see, Camp v Presbyterian Socy., 105 Misc 139; Matter of Carper, 67 AD2d 333, 337, affd 50 NY2d 974).
The court finds the facts as outlined earlier determinative regarding Cornelia Stewart’s intent, and concludes that so long as there are a minimum number of St. Mary and St. Paul students desirous of a parochial education at the merged school and a source of funds out of the gift exists, a school must continue. Cy pres relief is available to lift any restriction prohibiting leasing, so that one of the campuses may be leased to provide sufficient income to the other. Such resolution, in the court’s judgment, gives full design and most effectively accomplishes the Stewarts’ general purpose.
While respondent may contest this court’s power to direct that income from the St. Paul’s campus be used to support operation of the merged school at St. Mary’s, there is authority that such is within the court’s power under circumstances where the gift is one of a series given by the same donor to the same donee, and the income to maintain one is enough while for the other it is inadequate. There is no question that Cornelia Stewart is the donor of both gifts, one inter vivas and the other testamentary. The Chapter is the beneficiary of both gifts and, indeed, has itself treated them as one by merging St. Paul’s and St. Mary’s. It is disingenuous to claim that St. Mary’s is not before the court when St. Mary’s is merged with St. Paul’s. Similar circumstances existed in Camp v Presbyte *1062 rian Socy. (supra). There the testatrix provided for two distinct funds and two separate trusts, one to maintain a bell tower she had erected and the other to maintain a free library therein. The fund for maintenance of the library was inadequate, while the fund for maintenance of the tower produced a surplus. Acknowledging the distinct nature of the two gifts, the court nevertheless found that "they are each part of one single scheme in the mind of the testatrix” and that having constructed the tower and established a library therein it is not "supposable” that the testatrix "ever intended to leave the same unprovided for” (Camp v Presbyterian Socy., supra, at 148, 149). Here there is strong indication that the St. Paul’s campus, if leased as a dormitory to Adelphi, can generate enough income to retire the debt and continue the school at the St. Mary’s campus without incurring further debt. While New York courts are "cautious in divesting a named beneficiary” (Matter of Edwards, 86 AD2d 702, 703) nevertheless, "in the event a trustee is unwilling or unable to act, a court may replace the trustee with another” (Matter of Wilson, 59 NY2d 461, 475, supra). The court acknowledges that the intervenor nonprofit corporation stands ready to carry out the wishes of Cornelia Stewart if the Chapter is "unwilling or unable”.
The ancient practice under cy pres was to refer the matter to "a master” to "report a scheme to which the fund should be applied” (Camp v Presbyterian Socy., supra, at 148). However, the court finds that operating the merged school on one campus, while using the income of the other to retire debt and maintain the structures, are the provisions "which most closely approximate the expressed intent of the testator” (Matter of Wilson, 87 AD2d 98, 101, supra). Respondent’s proposition, which provides for a dormitory for Adelphi with voluntary or optional chaplain services, is not a "school” and is "foreign, to the intention of the testatrix” (Camp v Presbyterian Socy., supra, at 144). With these basic findings in mind, the court will entertain proposals from the petitioner, respondent and intervenor "to report a scheme to which the fund should be applied”. They shall have 60 days to report. It shall be kept in mind that a trustee is authorized "to accumulate the income * * * to carry out the purposes of the trust * * * subject * * * [t]o the supervision of the supreme court” (EPTL 8-1.7).
*1063 It seems appropriate in closing, given the esteem in which this school was and is held, to remember the words of Daniel Webster in the Dartmouth College case, "She is a small school, but there are those who love her”.