OPINION OF THE COURT
Chief Judge Cooke.
These appeals present the question whether the equal protection clause of the Fourteenth Amendment is violated when a court permits the administration of private charitable trusts according to the testators’ intent to finance the education of male students and not female students. When a court applies trust law that neither encourages, nor affirmatively promotes, nor compels private discrimination but allows parties to engage in private selection in the devise or bequest of their property, that choice will not be attributable to the State and subjected to the Fourteenth Amendment’s strictures.
_L
The factual patterns in each of these matters are different, but the underlying legal issues are the same. In each there is imposed a decedent’s intention to create a testamentary trust under which the class of beneficiaries are members of one sex.
In Matter of Wilson, article eleventh of Clark W. Wilson’s will provided that the residuary of his estate be held in trust (Wilson Trust) and that the income “be applied to *469 defraying the education and other expenses of the first year at college of five (5) young men who shall have graduated from the Canastota High School, three (3) of whom shall have attained the highest grades in the study of science and two (2) of whom shall have attained the highest grades in the study of chemistry, as may be certified to by the then Superintendent of Schools for the Canastota Central School District.” Wilson died in June, 1969 and for the next 11 years the Wilson Trust was administered according to its terms.
In early 1981, the Civil Rights Office of the United States Department of Education received a complaint alleging that the superintendent’s acts in connection with the Wilson Trust violated title IX of the Education Amendments of 1972 (US Code, tit 20, § 1681 et seq.), which prohibits gender discrimination in Federally financed education programs. The Department of Education informed the Canastota Central School District that the complaint would be investigated. Before the investigation was completed, the school district agreed to refrain from again providing names of students to the trustee. The trustee, Key Bank of Central New York, initiated this proceeding for a determination of the effect and validity of the trust provision of the will.
The Surrogate’s Court held that the school superintendent’s co-operation with the trustee violated no Federal statute or regulation prohibiting sexual discrimination, nor did it implicate the equal protection clause of the Fourteenth Amendment. The court ordered the trustee to continue administering the trust.
A unanimous Appellate Division, Third Department, modified the Surrogate’s decree. The court affirmed the Surrogate’s finding that the testator intended the trust to benefit male students only and, noting that the school was under no legal obligation to provide the names of qualified male candidates, found “administration of the trust according to its literal terms is impossible.” (87 AD2d, p 101.) The court then exercised its cy pres power to reform the trust by striking the clause in the will providing for the school superintendent’s certification of the names of qualified *470 candidates for the scholarships. The candidates were permitted to apply directly to the trustee.
Matter of Johnson also involves a call for judicial construction of a testamentary trust created for the exclusive benefit of male students. By a will dated December 13, 1975, Edwin Irving Johnson left his residuary estate in trust (Johnson Trust). Article sixth of the will provided that the income of the trust was to “be used and applied, each year to the extent available, for scholarships or grants for bright and deserving young men who have graduated from the High School of [the Croton-Harmon Union Free] School District, and whose parents are financially unable to send them to college, and who shall be selected by the Board of Education of such School District with the assistance of the Principal of such High School.”
Johnson died in 1978. In accordance with the terms of the trust, the board of education, acting as trustee, announced that applications from male students would be accepted on or before May 1,1979. Before any scholarships were awarded, however, the National Organization for Women, filed a complaint with the Civil Rights Office of the United States Department of Education. This complaint alleged that the school district’s involvement in the Johnson Trust constituted illegal gender-based discrimination.
During the pendency of the Department of Education’s investigation, a stipulation was entered into between the executrix of the will, the president of the board of education, and the Attorney-General. The parties sought “to avoid administering the educational bequest set forth in Article Sixth in a manner which is in conflict with the law and public policy prohibiting discrimination based on sex”. The stipulation provided that “all interested parties agree to the deletion of the word ‘men’ in Article Sixth of the Will and the insertion of the word ‘persons’ in its place.” The Attorney-General then brought this proceeding by petition to the Surrogate’s Court to construe article sixth of the will.
The Surrogate found that the trustee’s unwillingness to administer the trust according to its terms rendered ad *471 ministration of the trust impossible. The court, however, declined to reform the trust by giving effect to the stipulation. Rather, it reasoned that the testator’s primary intent to benefit “deserving young men” would be most closely effected by replacing the school district with a private trustee.
A divided Appellate Division, Second Department, reversed, holding that under the equal protection clause of the Fourteenth Amendment, a court cannot reform a trust that, by its own terms, would deny equal protection of law. The court reasoned that inasmuch as an agent of the State had been appointed trustee, the trust, if administered, would violate the equal protection clause. Judicial reformation of the trust by substituting trustees would, in that court’s view, itself constitute State action in violation of the Fourteenth Amendment. The court determined that administration of the trust was impossible and, in an exercise of its cy pres power, reformed the trust by eliminating the gender restriction.
JL
On these appeals, this court is called upon to consider the testators’ intent in establishing these trusts, evaluate the public policy implications of gender restrictive trusts generally, and determine whether the judicial reformation of these trusts violates the equal protection clause of the Fourteenth Amendment.
There can be no question that these trusts, established for the promotion of education, are for a charitable purpose within the meaning of the law (see EPTL 8-1.1; see, also, Russell v Allen, 107 US 163, 172; Butterworth v Keeler, 219 NY 446; see, generally, Bogert, Trusts and Trustees [rev 2d ed], § 375; 4 Scott, Trusts [3d ed], § 370). Charitable trusts are encouraged and favored by the law (see Bogert, op. cit., § 361), and may serve any of a variety of benevolent purposes (see EPTL 8-1.1). Among the advantages the law extends to charitable trusts are their exemption from the rules against perpetuities (see EPTL 9-1.1; Matter of MacDowell, 217 NY 454) and accumulations (EPTL 8-1.7) and their favorable tax treatment (see Bogert, Trusts and Trustees [rev 2d ed], § 264.25; 9B Rohan, NY Civ Prac, *472 pars 8-1.7[3] — 8-1.7[6]). Moreover, unlike other trusts, a charitable trust will not necessarily fail when the settlor’s specific charitable purpose or direction can no longer be accomplished.
When a court determines that changed circumstances have rendered the administration of a charitable trust according to its literal terms either “impracticable or impossible”, the court may exercise its cy pres power to reform the trust in a matter that “will most effectively accomplish its general purposes” (EPTL 8-1.1, subd [c]). In reforming trusts pursuant to this power, care must be taken to evaluate the precise purpose or direction of the testator, so that when the court directs the trust towards another charitable end, it will “give effect insofar as practicable to the full design of the testator as manifested by his will and codicil” (Matter of Scott, 8 NY2d 419, 427; see Bogert, Trusts and Trustees [rev 2d ed], § 442).
The court, of course, cannot invoke its cy pres power without first determining that the testator’s specific charitable purpose is no longer capable of being performed by the trust (see, e.g., Matter of Scott, supra; Matter of Swan, 237 App Div 454, affd sub nom. Matter of St. Johns Church of Mt. Morris, 263 NY 638; Matter of Fairchild, 15 Misc 2d 272). In establishing these trusts, the testators expressly and unequivocally intended that they provide for the educational expenses of male students. It cannot be said that the accomplishment of the testators’ specific expression of charitable intent is “impossible or impracticable.” So long as the subject high schools graduate boys with the requisite qualifications, the testators’ specific charitable intent can be fulfilled.
Nor are the trusts’ particular limitation of beneficiaries by gender invalid and incapable of being accomplished as violative of public policy. It is true that the eradication in this State of gender-based discrimination is an important public policy. Indeed, the Legislature has barred gender-based discrimination in education (see Education Law, § 3201-a), employment (see Labor Law, §§ 194, 197, 220-e; General Business Law, § 187), housing, credit, and many other areas (see Executive Law, § 296). As a result, women, once viewed as able to assume only restricted roles in our *473 society (see Bradwell v State, 16 Wall [83 US] 130, 141), now project significant numbers “in business, in the professions, in government and, indeed, in all walks of life where education is a desirable, if not-always a necessary, antecedent” (Stanton v Stanton, 421 US 7, 15). The restrictions in these trusts run contrary to this policy favoring equal opportunity and treatment of men and women. A provision in a charitable trust, however, that is central to the testator’s or settlor’s charitable purpose, and is not illegal, should not be invalidated on public policy grounds unless that provision, if given effect, would substantially mitigate the general charitable effect of the gift (see 4 Scott, Trusts [3d ed], § 399.4).
Proscribing the enforcement of gender restrictions in private charitable trusts would operate with equal force towards trusts whose benefits are bestowed exclusively on women. “Reduction of the disparity in economic condition between men and women caused by the long history of discrimination against women has been recognized as * * * an important governmental objective” (Califano v Webster, 430 US 313, 317). There can be little doubt that important efforts in effecting this type of social change can be and are performed through private philanthropy (see, generally, Commission on Private Philanthropy and Public Needs, Giving in America: Toward a Stronger Voluntary Section [1975]). And, the private funding of programs for the advancement of women is substantial and growing (see Bernstein, Funding for Women’s Higher Education: Looking Backward and Ahead, Grant Magazine, vol 4, No. 4, pp 225-229; Ford Foundation, Financial Support of Women’s Programs in the 1970’s [1979]; Yarrow, Feminist Philanthropy Comes Into Its Own, NY Times, May 21, 1983, p 7, col 2). Indeed, one compilation of financial assistance offered primarily or exclusively to women lists 854 sources of funding (see Schlacter, Directory of Financial Aids for Women [2d ed, 1981]; see, also, Note, Sex Restricted Scholarships and the Charitable Trust, 59 Iowa L Rev 1000, 1000-1001, & nn 10, 11). Current thinking in private philanthropic institutions advocates that funding offered by such institutions and the opportunities within the institutions themselves be directly responsive to the needs of *474 particular groups (see Ford Foundation, op cit., at pp 41-44; Fleming, Foundations and Affirmative Action, 4 Foundation News No. 4, at pp 14-17; Griffen, Funding for Women’s Programs, 6 Grantsmanship Center News, No. 2, at pp 34-45). It is evident, therefore, that the focusing of private philanthropy on certain classes within society may be consistent with public policy. Consequently, that the restrictions in the trusts before this court may run contrary to public efforts promoting equality of opportunity for women does not justify imposing a per se rule that gender restrictions in private charitable trusts violate public policy.
Finally, this is not an instance in which the restriction of the trusts serves to frustrate a paramount charitable purpose. In Howard Sav. Inst. v Peep (34 NJ 494), for example, the testator made a charitable bequest to Amherst College to be placed in trust and to provide scholarships for “deserving American born, Protestant, Gentile boys of good moral repute, not given to gambling, smoking, drinking or similar acts.” Due to the religious restrictions, the college declined to accept the bequest as contrary to its charter. The court found that the college was the principal beneficiary of the trust, so that removing the religious restriction and thereby allowing the college to accept the gift would permit administration of the trust in a manner most closely effectuating the testator’s intent (see, also, Matter of Hawley, 32 Misc 2d 624; Coffee v Rice Univ., 408 SW2d 269 [Tex]).
In contrast, the trusts subject to these appeals were not intended to directly benefit the school districts. Although the testators sought the school districts’ participation, this was incidental to their primary intent of financing part of the college education of boys who attended the schools. Consequently, severance of the school districts’ role in the trusts’ administration will not frustrate any part of the testators’ charitable purposes. Inasmuch as the specific charitable intent of the testators is not inherently “impossible or impracticable” of being achieved by the trusts, there is no occasion to exercise cy pres power.
Although not inherently so, these trusts are currently incapable of being administered as originally intended *475 because of the school districts’ unwillingness to co-operate. These impediments, however, may be remedied by an exercise of a court’s general equitable power over all trusts to permit a deviation from the administrative terms of a trust and to appoint a successor trustee.
A testamentary trust will not fail for want of a trustee (see EPTL 8-1.1; see, also, Matter of Thomas, 254 NY 292) and, in the event a trustee is unwilling or unable to act, a court may replace the trustee with another (see EPTL 7-2.6; SCPA 1502; see, also, Matter of Andrews, 233 App Div 547; 2 Scott, Trusts [3d ed], § 108.1). Accordingly, the proper means of continuing the Johnson Trust would be to replace the school district with someone able and willing to administer the trust according to its terms.
When an impasse is reached in the administration of a trust due to an incidental requirement of its terms, a court may effect, or permit the trustee to effect, a deviation from the trust’s literal terms (see 9A Rohan, NY Civ Prac, pars 7-2.4[3] — 7-2.4[4]). This power differs from a court’s cy pres power in that “[tihrough exercise of its deviation power the court alters or amends administrative provisions in the trust instrument but does not alter the purpose of the charitable trust, or change its dispositive provisions” (Bogert, Trusts and Trustees [rev 2d ed], § 394, p 249; see, e.g., Trustees of Sailors’ Snug Harbor v Carmody, 211 NY 286; Matter of Bruen, 83 NYS2d 197; Matter of Godfrey, 36 NYS2d 414, affd no opn 264 App Div 885). The Wilson Trust provision that the school district certify a list of students is an incidental part of the trust’s administrative requirements, which no longer can be satisfied in light of the district’s refusal to co-operate. The same result intended by the testator may be accomplished by permitting the students to apply directly to the trustee. Therefore, a deviation from the Wilson Trust’s administrative terms by eliminating the certification requirement would be the appropriate method of continuing that trust’s administration.
Ill
It is argued before this court that the judicial facilitation of the continued administration of gender-restrictive char *476 itable trusts violates the equal protection clause of the Fourteenth Amendment (see US Const, 14th Amdt, § 1). The strictures of the equal protection clause are invoked when the State engages in invidious discrimination (see Moose Lodge No. 107 v Irvis, 407 US 163, 173, 176-177; Burton v Wilmington Parking Auth., 365 US 715, 721; Civil Rights Cases, 109 US 3). Indeed, the State itself cannot, consistent with the Fourteenth Amendment, award scholarships that are gender restrictive (see Mississippi Univ. for Women v Hogan, 458 US 718; Kirchberg v Feenstra, 450 US 455; Stanton v Stanton, 421 US 7, supra).
The Fourteenth Amendment, however, “erects no shield against merely private conduct, however discriminatory or wrongful.” (Shelley v Kraemer, 334 US 1, 13; see Blum v Yaretski, 457 US 991, 1002; Jackson v Metropolitan Edison Co., 419 US 345, 349; Moose Lodge No. 107 v Irvis, 407 US 163, 171-179, supra; Evans v Abney, 396 US 435, 445). Private discrimination may violate equal protection of the law when accompanied by State participation in, facilitation of, and, in some cases, acquiescence in the discrimination (see, e.g., Burton v Wilmington Parking Auth., 365 US 715, supra; Reitman v Mulkey, 387 US 369; Shelley v Kraemer, 334 US 1, supra). Although there is no conclusive test to determine when State involvement in private discrimination will violate the Fourteenth Amendment (see Reitman v Mulkey, supra, at p 378), the general standard that has evolved is whether “the conduct allegedly causing the deprivation of a federal right [is] fairly attributable to the state” (Lugar v Edmondson Oil Co., 457 US 922, 937). Therefore, it is a question of “state responsibility” and “[o]nly by sifting facts and weighing circumstances can the * * * involvement of the State in private conduct be attributed its true significance” (Burton v Wilmington Parking Auth., 365 US 715, 722, supra).
The Supreme Court has identified various situations in which the State may be deemed responsible for discriminatory conduct with private origins. For example, one such instance appears when the State delegates one of its inherent functions to private parties and those parties engage in discrimination (see Lloyd Corp. v Tanner, 407 US 551; *477 Food Employees v Logan Plaza, 391 US 308; Evans v Newton, 382 US 296; Terry v Adams, 345 US 461; Marsh v Alabama, 326 US 501). Another arises when the State does not directly enforce or abet the private discrimination, but substantially facilitates and profits from it (Burton v Wilmington Parking Auth., 365 US 715, supra).
“The Court has never held, of course, that discrimination by an otherwise private entity would be violative of the Equal Protection Clause if the private entity receives any sort of benefit or service at all from the State, or if it is subject to State regulation in any degree whatever” (Moose Lodge No. 107 v Irvis, 407 US 163, 173, supra). Rather, “the State must have ‘significantly involved itself with invidious discriminations’ * * * in order for the discriminatory action to fall within the ambit of the constitutional prohibition” (id.; see, also, Rendell-Baker v Kohn, 457 US 830; Gilmore v City of Montgomery, 417 US 556).
The State generally may not be held responsible for private discrimination solely on the basis that it permits the discrimination to occur (see Flagg Bros. v Brooks, 436 US 149, 164; Jackson v Metropolitan Edison Co., 419 US 345, 357, supra; Moose Lodge No. 107 v Irvis, 407 US 163, 176, supra; Evans v Abney, 396 US 435, supra). Nor is the State under an affirmative obligation to prevent purely private discrimination (see Reitman v Mulkey, 387 US 369, 376, 377, supra). Therefore, when the State regulates private dealings it may be responsible for private discrimination occurring in the regulated field only when enforcement of its regulation has the effect of compelling the private discrimination (see Flagg Bros. v Brooks, supra; Moose Lodge No. 107 v Irvis, supra; Shelley v Kraemer, 334 US 1, supra; cf. Adickes v Kress & Co., 398 US 144, 170).
In Shelley v Kraemer (supra), for example, the Supreme Court held that the equal protection clause was violated by judicial enforcement of a private covenant that prohibited the sale of affected properties to “people of Negro or Mongolian Race.” When one of the properties was sold to a black family, the other property owners sought to enforce the covenant in State court and the family was ordered to move from the property. The Supreme Court noted “that the restrictive agreements standing alone cannot be re *478 garded as violative of any rights guaranteed to petitioners by the Fourteenth Amendment. So long as the purposes of those agreements are effectuated by voluntary adherence to their terms, it would appear clear that there has been no action by the State and the provisions of the Amendment have not been violated” (334 US, at p 13). The court held, however, that it did have before it cases “in which the States have merely abstained from action leaving private individuals free to impose such discriminations as they see fit. Rather, these are cases in which the States have made available to such individuals the full coercive power of the government to deny petitioners, on the grounds of race or color, the enjoyment of property rights” (id., at p 19). It was not the neutral regulation of contracts permitting parties to enter discriminatory agreements that caused the discrimination to be attributable to the State. Instead, it was that the State court’s exercise of its judicial power directly effected a discriminatory act.
In Barrows v Jackson, (346 US 249, supra), the court applied the same reasoning when it held that a court’s awarding damages against a party who has breached a racially restrictive covenant also violates the equal protection clause. The court reiterated that “voluntary adherence [to the covenant] would constitute individual action only” (id., at p 253). But, “[t]o compel respondent to respond in damages would be for the State to punish her for failure to perform her covenant to continue to discriminate against non-Caucasians in the use of her property * * * Thus, it becomes not respondent’s voluntary choice but the State’s choice that she observe her covenant or suffer damages” (id., at p 254).
More recently, the Supreme Court considered whether a State’s regulation of private clubs licensed to serve liquor caused a club’s restrictive membership policy to be attributable to the State (see Moose Lodge No. 107 v Irvis, 407 US 163, supra). The court held that although the State extensively regulated these private clubs, it was not responsible for the private discrimination simply because the regulation permitted the discrimination to occur. The court stated that “[hjowever detailed this type of regulation may be in some particulars, it cannot be said to in any way *479 foster or encourage * * * discrimination” (407 US, at pp 176-177). The court distinguished the regulatory scheme’s general neutral effect on the discrimination from a situation in which that scheme could be used to compel discrimination. One of the regulations provided that “ ‘[e]very club licensee shall adhere to all of the provisions of its Constitution and By-Laws’ ” (id., at p 177). The court acknowledged that if this regulation were used (at p 178) “to place state sanctions behind [the licensee’s] discriminatory membership rules,” the Fourteenth Amendment would be implicated. Accordingly, the court enjoined enforcement of the regulation.
A court’s application of its equitable power to permit the continued administration of the trusts involved in these appeals falls outside the ambit of the Fourteenth Amendment. Although the field of trusts is regulated by the State, the Legislature’s failure to forbid private discriminatory trusts does not cause such trusts, when they arise, to be attributable to the State (see Flagg Bros. v Brooks, 436 US 149, 165, supra; see, also, Evans v Abney, 396 US 435, 458 [Brennan, J., dissenting], supra). It naturally follows that, when a court applies this trust law and determines that it permits the continued existence of private discriminatory trusts, the Fourteenth Amendment is not implicated.
In the present appeals, the coercive power of the State has never been enlisted to enforce private discrimination. Upon finding that requisite formalities of creating a trust had been met, the courts below determined the testator’s intent, and applied the relevant law permitting those intentions to be privately carried out. The court’s power compelled no discrimination. That discrimination had been sealed in the private execution of the wills. Recourse to the courts was had here only for the purpose of facilitating the administration of the trusts, not for enforcement of their discriminatory dispositive provisions.
This is not to say that a court’s exercise of its power over trusts can never invoke the scrutiny of the Fourteenth Amendment. This court holds only that a trust’s discriminatory terms are not fairly attributable to the State when a court applies trust principles that permit private discrimi *480 nation but do not encourage, affirmatively promote, or compel it.
The testators’ intention to involve the State in the administration of these trusts does not alter this result, notwithstanding that the effect of the courts’ action respecting the trusts was to eliminate this involvement. The courts’ power to replace a trustee who is unwilling to act as in Johnson or to permit a deviation from an incidental administrative term in the trust as in Wilson is a part of the law permitting this private conduct and extends to all trusts regardless of their purposes. It compels no discrimination. Moreover, the minimal State participation in the trusts’ administration prior to the time that they reached the courts for the constructions under review did not cause the trusts to take on an indelible public character (see Evans v Newton, 382 US 296, 301; Commonwealth of Pennsylvania v Brown, 392 F2d 120).
In sum, the Fourteenth Amendment does not require the State to exercise the full extent of its power to eradicate private discrimination. It is only when the State itself discriminates, compels another to discriminate, or allows another to assume one of its functions and discriminate that such discrimination will implicate the amendment.
Accordingly, in Matter of Wilson, the order of the Appellate Division should be affirmed, with costs payable out of the estate to all parties appearing separately and filing separate briefs.
In Matter of Johnson, the order of the Appellate Division should be reversed, with costs payable out of the estate to all parties appearing separately and filing separate briefs and the decree of the Surrogate’s Court, Westchester County, reinstated.