OPINION OF THE COURT
Frank R. Seddio, S.
This is an uncontested proceeding by Polytechnic University for cy pres relief pursuant to EPTL 8-1.1 (c).
Background
Mildred Topp Othmer died on April 9, 1998. Her will, dated August 8, 1988, was admitted to probate by this court on December 30, 1998. In her will, she left a substantial amount of her estate to Polytechnic University. In article one of the will, she left her real property, worth $2,800,000, to Polytechnic University. In article eight, she left $2,000,000 to the University under the following restrictions: part or all of the gift was to endow the Othmer Distinguished Professorship of Chemical Engineering and the balance to either endow a number of Othmer Graduate Research Fellowships or to be held as the Othmer Endowment Fund. The Othmer Endowment Fund was to be held either in perpetuity and the income used for general purposes of the University, or it could also be used to construct or acquire a building to be named the Donald F. and Mildred Topp Othmer Building.
In addition to this sizable gift, she left 25% of her residuary estate, worth approximately $126,000,000 to the University, to be added to the gift provided for in article eight and administered under the same conditions.[1] The estate administration was concluded and the accounting proceeding settled by decree dated June 17, 2003. The Polytechnic University received over $130,000,000 under the will. It is currently holding approximately $70,400,000 in the Othmer Endowment Fund, subject to the restrictions of article eight of the will.
Polytechnic University, located in Brooklyn, New York, is an educational institution serving a diverse population of men and *416 women interested in science, technology and engineering. The Othmer bequests fueled a successful capital campaign, concluded in 2001. The result was the transformation of the University from a commuter school to a residential university. In 2000, the University undertook significant upgrades to its plant and infrastructure. As part of this program, the University borrowed $90,000,000 from the New York City Industrial Development Agency (IDA) and executed a bond (the IDA bond) for the construction of a new residence hall, new academic and athletic facilities, and improvements to the University facilities.
Under the terms of the IDA bond, the University is required to maintain sufficient tuition, fees and other unrestricted revenues to equal 110% of the debt service requirements of the bond (the liquidity covenant), measured every June and December. If the unrestricted income falls below this amount, the University has two years to meet the liquidity covenant. Failure to meet the liquidity requirement within the two years is an event of default. In addition, the failure to collect unrestricted income equal to the debt service is an event of default. Finally, the University agreed to maintain a fund of cash or unrestricted quasi-endowment investments equal to at least $15,000,000 (the collateral covenant). In 2006, the amount increases to $20,000,000. Failure to meet this requirement is also an event of default.
Less than a year after receiving the funds, a number of unforeseen events occurred. On September 11, 2001, terrorists attacked the World Trade Center. Around the same time, there was a massive technological dislocation, commonly referred to as the dot.com bust. Finally, there has been growing shift of informational technology jobs to off-shore companies and sites. These events negatively impacted upon the University in a number of ways. The most immediate effect was a decrease in enrollment. This negatively impacted University income. A secondary effect was the decrease in income generated by the endowment. The net result was operating deficits that exhausted the University’s reserves.
By 2004, the losses had become significant enough to endanger the University’s ability to grant scholarships and loans under federal programs. These programs, authorized by title IV of the Higher Education Act of 1965, include such programs as the Stafford Loan Program, the Federal Plus Program, the Perkins Loan Program and Federal College Study Programs. To participate in title IV programs, an educational institution must *417 demonstrate that it is able to meet all of its financial responsibilities under the Act (34 CFR, ch VI, subpart L, § 668.171). An educational institution is deemed financially responsible if the Secretary of Education determines that: (1) three ratios measuring the institution’s financial condition (denominated the equity, primary reserve and net income ratios) yield a composite score of at least 1.5, (2) the institution has sufficient cash reserves to make required returns of unearned title IV program funds, and (3) the institution is current in its debt payments (34 CFR, ch VI, subpart L, § 668.171 [b]). In 2004, the University’s composite score fell below 1.5. However, a number of one-time, nonrecurring events enabled the University to increase its composite score above the 1.5 threshold.
As a result of the operating deficits, the University engaged in a cost reduction program. It eliminated staff positions, reduced pensions and salary increases, and delayed certain projects. The University saved approximately $12,000,000 by the fall of 2002. These efforts have helped ease the strain. Nonetheless, enrollment has not yet returned to the pre-2001 level. The University is projected to run a cash deficit of approximately $6,000,000 in fiscal year 2005/2006. Based on current projections, the University will run out of cash in April of this year.
The long-term solution is to increase the student enrollment at the University. However, the short-term pressures on the University place its ability to meet this objective in jeopardy. Unless something is done quickly, the University is projected to fail to meet the liquidity covenant and asset covenant of the IDA bond by June 30, 2006. Perhaps even more urgent is the fact that the University is projected to fall below the 1.5 composite score required under title IV of the federal legislation, jeopardizing its ability to receive federal financial aid directly and from the State. This has prompted the New York State Department of Education to request a meeting with the University to establish how the University proposes to improve its score.
The University will fail the financial responsibility tests if its composite score is not increased to 1.5 by June 30, 2006. In addition, an event of default under the IDA bond could trigger an independent finding that the University was not financially eligible to participate in title IV educational grants. This could jeopardize the University’s ability to offer federal student financial assistance under programs authorized by title IV of the Act. This would affect the University’s ability to attract *418 candidates to its degree programs, endangering its long-term future.
The Cy Pres Proceeding
The University alleges that changes of circumstances have made literal compliance with the testator’s will impracticable, if not impossible, and the proposed change is essential to effectuate the purposes of the testatrix. The University asks that this court modify the restrictions on the Othmer Endowment Fund to the extent that $10,400,000 of its assets be reclassified as temporarily restricted or unrestricted funds.
To meet the title IV ratio, the university must achieve either: (1) a surplus of $10,000,000 routinely, (2) unrestricted funds must increase by $10,000,000, or (3) temporarily restricted funds must increase by $10,000,000. In addition, as discussed above, the University’s IDA bond covenants require a debt coverage ratio of 1:10 every June 30 and $15,000,000 in unrestricted funds each June 30 and December 31. The asset covenant increases to $20,000,000 on December 31, 2006.
The University asks that $8,400,000 in the Othmer Endowment Fund be moved from permanently restricted to temporarily restricted funds. This would increase the unrestricted revenue to achieve the 1:10 debt ratio required under the liquidity covenant. Over the next three years, funds will be released from temporarily restricted funds to unrestricted funds to satisfy the debt coverage requirements. This will also enable the University to satisfy the title TV composite requirement. The University also requests that $5,000,000 be moved from permanently restricted to unrestricted funds to meet the bond requirement that the University have at least $20,000,000 in unrestricted assets by June 30, 2006. The $5,000,000 will not be expended, but be added to unrestricted reserves to meet the liquidity covenant until the University is able to restore the restricted funds or by 2030 at the latest.
Discussion
Where the court can discern a general charitable intent, the court may ensure that the charitable trust created when property is given in trust for a particular charitable purpose will not fail if it becomes impossible or impractical to fulfill the particular purposes under the doctrine of cy pres. Under this doctrine, the court will fashion relief so that the trust fund is applied to a similar charitable purpose. The rationale behind the doctrine of *419 cy pres is that there is a public policy in favor of upholding gifts for charitable purposes. To this end, “although the testator intended that the property should be applied to a particular charitable purpose named by him, yet he had a more general intention to devote the property to charitable purposes. The testator would presumably have desired that the property should be applied to purposes as nearly as may be like the purposes stated by him rather than that the trust should fail altogether.” (4A Fratcher, Scott on Trusts § 399, at 476 [4th ed].)
The doctrine of cy pres has been codified in EPTL 8-1.1. The section governs “charitable dispositions,” whether in trust or by outright disposition to charities (Lefkowitz v Lebensfeld, 68 AD2d 488 [1st Dept 1979], affd 51 NY2d 442 [1980]). Pursuant to EPTL 8-1.1, the Surrogate’s Court has the jurisdiction to hear such applications where the trust is established by will. In such cases, the surrogate may direct that such disposition be administered and applied in such manner as in the judgment of the court will most effectively accomplish its general purposes, whenever it appears to such court that circumstances have so changed since the execution of an instrument making a disposition for religious, charitable, educational or benevolent purposes as to render impracticable or impossible a literal compliance with the terms of such disposition (EPTL 8-1.1 [c]; see Matter of Randall, 68 Misc 2d 119 [Sur Ct, NY County 1971], affd 38 AD2d 1012 [1972]).
The courts have required three conditions before applying the doctrine: (1) that the gift or trust be charitable in nature; (2) that the donor must have demonstrated a general, rather than a specific, charitable intent; and (3) that circumstances have changed subsequent to the gift that render literal compliance with the restriction impossible or impracticable (see Matter of Post, 2 AD3d 1091 [3d Dept 2003]).
This is not the first cy pres proceeding involving a restricted charitable bequest under Mildred Othmer’s will. In 2000, the Long Island College Hospital (LICH) petitioned to modify the restrictions on its bequests under the wills of both Donald and Mildred Othmer so that it could use $90,000,000 of endowment as collateral for loans restructuring the hospital’s debt. As required under EPTL 8-1.1, LICH claimed that the Othmers had a general charitable intent to benefit LICH, that LICH had severe financial needs due to changed circumstances in the health care industry and that the proposed modifications of the *420 restrictions to enable LICH to use the endowed funds as collateral for loans to restructure its debt were necessary to save the hospital from bankruptcy with the least deviation from the original bequest. The Attorney General was cited and approved the petition. The application was granted by this court (Matter of Othmer, 185 Misc 2d 122 [Sur Ct, Kings County 2000]).
The University asks that the court apply the doctrine of collateral estoppel to find that the conditions required to be satisfied to apply the doctrine of cy pres have been met. The doctrine of collateral estoppel bars relitigation of factual issues that have been adjudicated by a prior, valid, final judgment between the parties (9 Carmody-Wait 2d § 63:445, at 398). Before the collateral estoppel can be found, it is necessary to show that the issue on which preclusion is sought is identical with the issue in the prior proceeding, that the issue was necessarily determined in the prior proceeding and that the litigant who will be held precluded in the present proceeding had a full and fair opportunity to litigate the issue (Continental Cas. Co. v Rapid-American Corp., 80 NY2d 640 [1993]; Gilberg v Barbieri, 53 NY2d 285 [1981]).
Although the doctrine has rarely been applied to cy pres proceedings, there is no legal impediment to applying the doctrine where the conditions for its application have been met (see, e.g., Solow v Manhattan School of Music, 106 AD2d 624 [2d Dept 1984]; Stephens v Domestic & Foreign Mission Socy. of Prot. Episcopal Church in U.S. of Am., 20 Misc 2d 1061 [Sup Ct, Orange County 1959]).
However, in order for the doctrine of collateral estoppel to apply, there must be an identity of issues necessarily decided in the prior proceeding and to be decided in the instant proceeding (Kret v Brookdale Hosp. Med. Ctr., 61 NY2d 861 [1984]). In the instant case, the prior proceeding dealt with issues specific to Long Island College Hospital, namely, whether the bequest was charitable in nature; whether the bequest was part of a general charitable intent to that charity; and whether the charity experienced circumstances subsequent to the gift that rendered literal compliance with the restriction impossible or impracticable. A finding on these factual issues is not determinative of the University’s application under the same doctrine. Just as two wills are rarely exactly alike, the situations confronting two charities are rarely identical. Accordingly, the court declines to find that the conditions for applying cy pres are met by applying the doctrine of collateral estoppel.
*421 Turning to the petition before the court, there is no question that gifts for educational purposes are charitable in nature and such gifts create valid charitable trusts (Matter of Davidge, 200 App Div 437 [2d Dept 1922]). Indeed, gifts for “religious, educational, charitable or benevolent uses” have been considered charitable trusts ever since the enactment of the Tilden Act, New York’s first statutory codification of the doctrine of cy pres (L 1893, ch 701).
The record also establishes that the testatrix had a general charitable intent, rather than a specific one, in making the bequests to the University. This general intention is found by the overriding charitable nature of her will. She left a large estate of over $623,000,000. Under her will, approximately $531,000,000, or 70% of the assets distributed, was left to named charities.[2] This is evidence of a general charitable intention (see Matter of Bowne, 11 Misc 2d 597 [Sur Ct, NY County 1958]; Matter of Othmer, 185 Misc 2d 122 [Sur Ct, Kings County 2000]).
The fact that the will does not have any express condition divesting the bequest, or any gift over, is further evidence that the testatrix would not have wanted the gift to lapse (Matter of Kraetzer, 119 Misc 2d 436 [Sur Ct, Kings County 1983]). The court notes that the testatrix’s husband, Dr. Donald Othmer, had been a chemical engineer and a professor at the University. He left substantial funds to the University and, in his will, which was admitted to probate on July 8, 1996, he called the University his “long-time academic home.” Dr. Othmer and his wife were members of the University community for over 40 years. Based on the record, it is clear that the testatrix would not have wanted the bequest to fail because of unforeseen later events.
In order to apply the doctrine of cy pres, it must be shown that the specific charitable purposes are no longer capable of being performed (Matter of Wilson, 59 NY2d 461 [1983]; Matter of Post, 2 AD3d 1091 [3d Dept 2003]). There must be evidence that there has been a change of circumstances such that the particular charitable intention of the testator fails (Matter of Haskett, 4 Misc 2d 1065 [Sur Ct, Westchester County 1957]; Matter of Dean, 167 Misc 238 [Sur Ct, Westchester County 1938]).
*422 In the instant case, the record reveals that after receiving the substantial bequest, the University engaged in a substantial capital improvement program and the transformation of its orientation into a residential university. As part of this program, it entered into a $90,000,000 loan from the IDA. Under the loan agreement, the University must maintain certain asset ratios. As a result of the terrorist attacks on the World Trade Center and their effect on the local economy, combined with the near meltdown of technological companies in 2001, the University has seen its income diminish substantially. These unforeseen economic events have affected the ability of the University to attract students to its programs, resulting in an operating deficit. The effect on the economy has also hurt its income from fees and investment income.
These events have caused the University to fall below the liquidity covenant and asset covenant under its IDA loan. They have also caused the University to fall below the composite score requirements necessary for the University to participate in federal financial aid programs. These programs include such basic programs as Pell grants and Stafford loans. The inability to offer these financial inducements to its projected students could threaten the ability of the University to attract a sufficient student body, jeopardizing its current financial standing as well as its long-term plans.
The last requirement for the application of cy pres is that the proposed modification most closely approximates the intent of the testatrix (Matter of Wilson, 87 AD2d 98 [3d Dept 1982], affd 59 NY2d 461 [1983]). The University has attempted to meet its financial challenges with a program to reduce its costs. However, this effort is not sufficient by itself. To meet the covenants under the IDA bond as well as its obligations under federal law, it is necessary to transfer funds from the Othmer Fund to unrestricted funds.
The University emphasizes that the proposed modifications to the Othmer Endowment Fund do not entail the expenditure of cash. Rather, it is a bookkeeping transaction designed to increase unrestricted funds to meet federal and loan mandates. It is expected that the $5,000,000 recharacterized to meet the asset covenant of the IDA bond will revert to its restricted status when no longer needed, or by 2030 at the latest.
There is no question but that the testatrix’s charitable intentions will be frustrated if Polytechnic University is forced to suspend operations because of its inability to meet the require *423 ments under title IV of the Act and its bond covenants. The Othmers were long-standing members of the University community. They were deeply involved with the educational mission of the University. In many instances, they made gifts during their lifetimes from their own funds for students’ education or University projects. It is inconceivable that they would have wanted the educational mission of the University to be frustrated because of its current situation. The Attorney General has reviewed the proposal and agrees to the proposed modification.
Accordingly, the petition of the University is granted.

. In addition, her husband, Donald Othmer, left substantial moneys to Polytechnic University, which he called his “long-time academic home.”

. Even this percentage understates the decedent’s charitable intent, since approximately $20,000,000 was distributed to relatives of the decedent in satisfaction of a will contest.