*920 OPINION OF THE COURT
Frank R. Seddio, S.
This is an uncontested petition to release funds in the Othmer Endowment Fund, a restricted fund of the Long Island College Hospital (LICH or the Hospital), under the doctrine of cy pres, as codified under EPTL 8-1.1 (c). The funds were given to LICH under the wills of Dr. Donald F. Othmer and his wife, Mildred Topp Othmer.
Background
Dr. Donald Othmer died on November 1, 1995, and his will was admitted to probate by this court on July 8, 1996. Pursuant to article Nine, clause (b), Dr. Othmer bequeathed $3,500,000 to LICH, to be held as the Othmer Endowment Fund in perpetuity, with the income only to be used for general purposes. This was in addition to the $1,000,000 that he and his wife gave LICH for the same purpose in December of 1988. In addition, Dr. Othmer bequeathed 5% of his residuary estate (up to a maximum of $10 million) and one quarter of the balance of the residuary estate to LICH. His will directed that these amounts be added to the Othmer Endowment Fund and administered under the conditions established by article Nine, clause (b). LICH received approximately $37,000,000 from the estate of Dr. Othmer dedicated to the Othmer Endowment Fund.
Mildred Topp Othmer died on April 8, 1998, and her will was admitted to probate by this court on December 30, 1998. Pursuant to article Eight, clause (b), she bequeathed $4,000,000 to LICH as the Othmer Endowment Fund, to be held either in perpetuity with the income to be used for general purposes, or in part or in whole for the construction or acquisition of a building to be called the Donald F. and Mildred Topp Othmer building. In addition, she left 20% of her residuary estate to LICH, to be added to the Othmer Endowment Fund and administered under the conditions established by article Eight, clause (b). LICH received approximately $98,000,000 from the estate of Mildred Topp Othmer dedicated to the Othmer Endowment Fund.
The present day value of the Othmer Endowment Fund is approximately $133,250,000.
Prior Cy Pres Proceeding
Since the death of the Othmers, there have been dramatic changes in the health care industry, that have negatively *921 impacted the financial status of New York hospitals. Among the changes witnessed by the hospitals are (1) the growth in managed care for both privately insured and Medicaid patients, with attendant high administration costs and reduced reimbursement rates, (2) the deregulation of the private sector hospital rate setting system under the Health Care Reform Act of 1996,* (3) the reduction in Medicare revenue enacted in the Balanced Budget Act of 1997, which was phased in over five years beginning in 1998, (4) the increasing numbers of uninsured patients, and (5) the shifting of emphasis from higher paying inpatient care to lower paying ambulatory care.
Base rates for Medicaid and Medicare patients have since failed to keep up with inflation, let alone the increased costs of providing medical care. Furthermore, LICH was no longer reimbursed by the State for the cost of capital improvements. Instead, such improvements were expected to come out of operating surplus. In fact, hospitals rarely realized operating surpluses. Since failure to keep up with medical advances could jeopardize a hospital’s ability to attract and treat its patients, LICH was forced to fund such improvements out of operating funds.
As a result of the severe economic pressures exerted on it, LICH found itself in dire financial straits. In March 2000, LICH adopted a recovery plan to meet these challenges. As part of the recovery plan, LICH became a member of a larger system of hospitals, called Continuum Health Partners, Inc., consisting of LICH, Beth Israel Medical Center, St. Luke’s Roosevelt Hospital Center and New York Eye and Ear Infirmary, to provide for savings in purchasing and improving cash flow. LICH appointed a new chief executive officer, chief financial officer and chief operating officer to deal with the new conditions. New ambulatory facilities were created.
However, key parts of the plan required the use of Othmer funds to secure loans for capital improvements and working capital. Under the recovery plan, LICH proposed to refinance its existing mortgage, secured by the FHA, and increase the size of the loan by $63.4 million to fund necessary capital improvements that were projected to increase hospital utilization. It also proposed to obtain $25 million from commercial loans to provide additional working capital. However, these borrowings *922 would require additional collateral. Since LICH had already maximized its debt capacity, it proposed to use funds from the Othmer Endowment Fund as collateral. After the FHA mortgage and the commercial paper loans were repaid, the collateral would be restored to the Othmer Endowment Fund as restricted funds. In addition, LICH proposed to use $15 million from the Othmer Endowment Fund to purchase and renovate a medical treatment facility at 340 Court Street in Brooklyn, to be named after Donald F. and Mildred Topp Othmer.
The Hospital petitioned the court to modify the restrictions on the bequests under the wills of Donald and Mildred Othmer pursuant to the doctrine of cy pres, as codified in EPTL 8-1.1 (c). LICH requested that the court exercise its cy pres powers to modify the restrictions in the wills to allow the Hospital to use a sufficient portion of the Othmer Endowment Fund to secure the new financing for strategic capital projects and working capital, and to interpret Mildred Othmer’s will to permit the Hospital to spend approximately $15 million to acquire and renovate the treatment facility. In its petition, LICH emphasized that these measures were necessary if it is to compete successfully and survive economically in the changing health care environment. The Attorney General appeared and filed an affidavit in support of the petition.
EPTL 8-1.1 provides that the Surrogate’s Court may direct that charitable dispositions be administered and applied in such manner as in the judgment of the court will most effectively accomplish its general purposes, whenever it appears to such court that circumstances have so changed since the execution of an instrument making a disposition for religious, charitable, educational or benevolent purposes as to render impracticable or impossible a literal compliance with the terms of such disposition (EPTL 8-1.1 [c]; see Matter of Randall, 68 Misc 2d 119 [Sur Ct, NY County 1971], affd 38 AD2d 1012 [1972]).
The courts require a charity to meet three conditions before applying the doctrine of cy pres: (1) that the gift or trust be charitable in nature; (2) that the donor must have demonstrated a general, rather than a specific, charitable intent; and (3) that circumstances have changed subsequent to the gift that render literal compliance with the restriction impossible or impracticable (see Matter of Wilson, 59 NY2d 461 [1983]).
In its decision the court found that the gift to LICH was charitable in nature (Matter of Syracuse Univ. [Hendricks], 4 NY2d 744 [1958]; Matter of Lawless, 194 Misc 844 [Sur Ct, *923 Kings County 1949], affd 277 App Div 1045 [1950]; Knickerbocker Hosp. v Goldstein, 181 Misc 540 [Sup Ct, NY County 1943]). The court next found that the Othmer’s bequests to LICH evidenced a general, rather than a specific, charitable intent. The court noted that the Othmers had a lifetime pattern of philanthropy to LICH and described it as a “favorite institution” and as their “mutual top priority.” During their lifetimes, Dr. and Mrs. Othmer were closely associated with LICH and engaged in many activities to promote its existence and ensure its continuing medical service to the community. For many years, Dr. Othmer served on LICH’s Board of Regents, and its governing board, as well as numerous committees. They also made substantial monetary contributions to the Hospital, notably a gift of $1 million to its “Give to Life Campaign” and another gift of $1 million to establish the Othmer Cancer Center.
Supporting this conclusion were the facts that Dr. and Mrs. Othmer left almost their entire substantial estates to charities (see Matter ofBowne, 11 Misc 2d 597 [Sur Ct, NY County 1958]; Matter of Othmer, 185 Misc 2d 122 [Sur Ct, Kings County 2000]), the substantial discretion given to LICH under the bequests (Matter of Syracuse Univ. [Hendricks], 4 NY2d 744 [1958]) and the fact that the gifts vested, with no gift over (Matter of Goehringer, 69 Misc 2d 145, 149-150 [Sur Ct, Kings County 1972]; see also Matter of Carper, 67 AD2d 333 [4th Dept 1979], affd 50 NY2d 974 [1980]).
The court next found that the forces buffeting the health care industry in general, and LICH in particular, were unforeseen changes that jeopardized the donors’ charitable intentions. Finally, the court found that the proposed loan was the best practical solution that would preserve the donors’ charitable intent. The court applied the doctrine of cy pres to approve the use of restricted funds as collateral as requested (Matter of Othmer, 185 Misc 2d 122 [Sur Ct, Kings County 2000]). Pursuant to the decree, approximately $92,000,000 from the Othmer Endowment Fund was segregated to serve as collateral for the FHA mortgage and the working capital short term loans.
The Instant Cy Pres Proceeding
The original recovery plan, of which the cy pres proceeding was a key part, has achieved many of its goals. The Hospital has a new president and a chief executive officer. Its participation in the Continuum Health Partners system has resulted in improved cash flow from billing and collection, reduction of operating ex *924 penses and increased operating efficiency. It has made numerous capital improvements, including the modernization of facilities and creation of new laboratories and offices, the renovation of its ambulatory care center, emergency facilities, cancer care facilities and rehabilitative treatment facility. The refinancing has resulted in savings of millions of dollars in financing costs.
Nonetheless, the Hospital is still subject to the economic forces that have buffeted the health care industry. Almost two thirds of the Hospital’s income comes from reimbursement under the Medicare or Medicaid program (68% in 2003, 66% in 2004). The reimbursement rates set by the federal and state governments have failed to keep pace with the rate of inflation, let alone the increased cost of providing health care. For example, Medicare base reimbursement rates increased by only 0.07% in 2005. The Medicaid base rate, set by the federal Centers for Medicare and Medicaid Services, increased by only 1.25% in 2005 and Medicaid fee-for-service emergency room and outpatient rates have been frozen for 14 years. The decreased rates paid under the Balanced Budget Amendment of 1997 have decreased the Hospital’s revenues by $18 million for the period from 2002 to 2004. In addition, changes in Medicare’s methods of calculating outlier payments decreased the Hospital’s Medicare revenue in 2004 by nearly $1.3 million and will continue to decrease such payments in the future.
State legislation has imposed additional cuts in state funding of the Medicaid program. In addition, new taxes on the Hospital’s gross receipts have cost LICH $800,000 per year. The growth in managed care and the increased number of uninsured patients, noted in the original cy pres petition, has reduced Hospital revenues. The Hospital has found itself in the position of servicing an increasing volume of patients, but receiving a lower amount of revenue.
Finally, the Hospital is required to fund needed improvements in delivering health care out of operating surplus, which does not exist. This is in addition to increased costs mandated by requirements prescribed after the terrorist attack on the World Trade Center and the subsequent Anthrax scare. As a result, LICH has experienced operating losses of approximately $12 million per year. This has forced the Hospital to forgo needed improvements and delay paying its suppliers, resulting in higher costs of supplies and the threat that its vendors will cease doing business with it.
The result of these forces have been felt by the entire health care industry. In the past three years, three hospitals and four *925 divisions of hospitals have closed. In July 2005, St. Vincent’s Catholic Medical Centers, one of the larger health care systems in New York, filed for chapter 11 bankruptcy. Despite its economic situation, the success of the recovery plan depends upon LICH’s ability to increase operating capital and achieve operating surpluses over the long haul. LICH believes that it will be able to achieve this if it is able to borrow $15 million from the Othmer Endowment Fund to pay down its accounts payable and invest an additional $10 million to fund critical and strategic capital projects. The Attorney General has reviewed the petition and filed an affidavit in support.
Discussion
As noted above, key factual issues in the instant cy pres proceeding were raised and determined in the prior cy pres proceeding. To the extent that these factual issues are identical to the issues in the current cy pres proceeding, and the parties in this proceeding had an opportunity to be heard in the prior proceeding, the factual issues determined in the prior cy pres proceeding should be binding and there is no need to relitigate them.
The use of the doctrine is rare because the factual issues determined in a cy pres proceeding involve facts specific to the charity seeking cy pres relief, limiting the usefulness of a prior cy pres proceeding to a charity not involved in the original proceeding (see Matter of Othmer, 12 Misc 3d 414 [Sur Ct, Kings County 2006]). However, where a charity applies for additional relief under the doctrine, there is no inherent reason why the doctrine should not apply (see Solow v Manhattan School of Music, 106 AD2d 624 [2d Dept 1984]; Matter of Othmer, 12 Misc 3d 414 [2006]; Stephens v Domestic & Foreign Mission Socy. of Prot. Episcopal Church in U.S. of Am., 20 Misc 2d 1061 [Sup Ct, Orange County 1959]).
This is the situation in the instant case. In the prior cy pres proceeding, the court found that the gift to LICH was charitable in nature, that the Othmers had a general charitable intent to benefit LICH, that LICH had severe financial needs due to changed circumstances in the health care industry, and that the proposed modification of the restriction of the Othmer bequests was the option that most closely preserved the donors’ original charitable intentions. Inasmuch as the Attorney General is the only other party in interest in this proceeding, and was a party *926 to the prior cy pres proceeding, there is no impediment to using the doctrine of collateral estoppel (People v Trans World Airlines, 171 AD2d 76 [1st Dept 1991]; see Koch v Consolidated Edison Co. of N.Y., 62 NY2d 548 [1984]; Matter of Clamp, 193 AD2d 601 [2d Dept 1993]; 303 Realty Corp. v Albert, 154 AD2d 590 [2d Dept 1989]).
Accordingly, the findings made in the prior proceeding that the bequests to the Othmer Endowment Fund were charitable and that the donors’ charitable intent was a general, not specific, intent is established. Even without the benefit of the prior decision, the court notes that the record in this case leaves little doubt on these issues.
However, in order to apply the doctrine of cy pres, there must also be a showing that the specific charitable purposes are no longer capable of being performed (Matter of Wilson, 59 NY2d 461 [1983]; Matter of Post, 2 AD3d 1091 [3d Dept 2003]). There must be a showing that there has been a change of circumstances such that the particular charitable intention of the testator fails (Matter of Haskett, 4 Misc 2d 1065 [Sur Ct, Westchester County 1957]; Matter of Dean, 167 Misc 238 [Sur Ct, Westchester County 1938]).
As to this factual issue, that of a change of circumstances, public policy would seem to require that the charity not rely solely on the prior decision, but establish that events since the prior decision have acted to make the original plan approved in the prior proceeding ineffectual in achieving its goal of saving the Hospital.
In the instant case, the record shows that since the approval of the prior petition, the Hospital has been further damaged by the economic forces discussed in the prior decision. In addition, since the terrorist attack on the World Trade Center and the Anthrax scare, hospitals have been required to expend additional monies to upgrade their security systems and preparedness for treating victims of terrorist and biological attacks. As a result, the Hospital finds itself once again on the edge of bankruptcy. Despite its economic situation, the Hospital believes that it will be able to increase operating capital and achieve operating surpluses over the long haul, if it is able to borrow $25 million from the Othmer Endowment Fund to pay down its accounts payable and to invest in critical and strategic capital projects.
Moreover, the Hospital must establish that the application is the least invasive method of preserving the donors’ charitable *927 intent (Matter of Wilson, 87 AD2d 98 [3d Dept 1982], affd 59 NY2d 461 [1983]). The Attorney General has carefully reviewed the proposal and the financial documents upon which they were based and is satisfied that the application is narrowly tailored to preserve the Othmer Endowment Fund as much as possible and that granting the petition will enable LICH to fulfill its health care mission. He further reports that the relief requested is necessary to avoid a substantial risk of bankruptcy.
During their lifetimes, Dr. and Mrs. Othmer were closely associated with LICH and engaged in many activities to promote its existence and ensure its continuing medical service to the community. They made substantial monetary contributions to this end, both inter vivos and testamentary. This led the court to find in the prior proceeding that the Othmers would want LICH to continue as a hospital. Since that has become impracticable in light of its current financial circumstances, it is proper that the court exercise its cy pres powers “to prevent the suspension of a valuable community service and the failure of a definite charitable purpose.”
Literal compliance with the restrictive provisions of the Othmer Endowment Fund is impracticable because the income of LICH is insufficient to allow LICH to continue its operations and avoid bankruptcy. Modification of the restrictions to allow a sufficient portion of the Othmer Endowment Fund to be used to reduce the accounts payable and make the capital improvements to implement LICH’s recovery plan has the potential to keep the Hospital in operation and preserve the Othmers’ overriding general charitable intent.
Conclusion
In conclusion, the court finds that LICH has met the three required tests for application of the cy pres doctrine under EPTL 8-1.1. For that reason and also in reliance on the Attorney General’s support of the relief requested, the court grants LICH’s cy pres petition in its entirety.

 This act ended the system of setting hospital rates. Inevitably, the negotiated rates LICH obtained were lower than prior regulated charges.