# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
January 7, 2009 Session

## GEORGIA O'KEEFFE FOUNDATION (MUSEUM) v. FISK UNIVERSITY

**Appeal from the Chancery Court for Davidson County**
**No. 05-2994 III     Ellen Hobbs Lyle, Chancellor**

<hr>

**No. M2008-00723-COA-R3-CV - Filed July 14, 2009**

<hr>

At issue in this appeal are the respective rights of three parties concerning charitable gifts of 101 pieces of art given, subject to conditions, to Fisk University in the late 1940s and early 1950s.  The collection has an estimated present value in excess of $60 million.  Four of the pieces, including the painting *Radiator Building - Night, New York*, were the property of Georgia  O'Keeffe and given to the University by Ms. O'Keeffe.  The other ninety-seven pieces were part of a much larger collection formerly owned by Alfred Stieglitz, Georgia O'Keeffe's late husband.  The ninety-seven pieces were gifted to the University by Ms. O'Keeffe as executrix of the estate and/or as the owner of a life estate in the ninety-seven pieces.  All 101 pieces were charitable, conditional gifts that were subject to several restrictions, two of which are at issue here; the pieces could not be sold and the various pieces of art were to be displayed at Fisk University as one collection.  These proceedings began when Fisk University filed an *ex parte* declaratory judgment action seeking permission to sell two valuable pieces of the collection because it could no longer afford to maintain the collection pursuant to the conditions imposed 50 years earlier.  Thereafter, the Georgia O'Keeffe Museum intervened, followed by the Tennessee Attorney General.  The O'Keeffe Museum contended that any sale of the collection violated the conditions of the gifts and should result in the entire collection reverting to the Museum as the successor in interest to Ms. O'Keeffe's estate.  Later on, an offer by the Crystal Bridges Museum of Benton, Arkansas, was presented to the court pursuant to which the Crystal Bridges Museum would pay Fisk University $30 million to acquire a one-half interest in the entire collection and the right to exhibit the collection six months each year.  The trial court determined that the Georgia O'Keeffe Museum had standing to contest the sale of the pieces gifted by Georgia O'Keeffe and the Stieglitz estate; that the doctrine of *cy pres* was not an available remedy to Fisk University because the gifts were the result of a specific charitable intent, not a general charitable intent, and the petition to sell the collection was denied and dismissed.  On appeal, we have determined the Georgia O'Keeffe Museum lacks standing to participate in this action and therefore dismiss its intervening petition and relief sought.  Further, we have determined that the trial court erred in finding that Ms. O'Keeffe lacked general charitable intent.  Accordingly, we reinstate the University's *cy pres* petition and remand for the trial court to determine whether *cy pres* relief is available and, if so, to fashion the appropriate relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Reversed in Part,  and Remanded**

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P.J., M.S., joined. RICHARD H. DINKINS, J., also joined and filed a concurring opinion.

John P. Branham, Stacey A. Garrett and C. Michael Norton, Nashville, Tennessee, for the appellant, Fisk University.

William L. Harbison, Andrée Sophia Blumstein, L. Webb Campbell III, and Phillip F. Cramer, Nashville, Tennessee, for the appellee, The Georgia O'Keeffe Museum.

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General, Janet M. Kleinfelter, Senior Counsel, and William H. Helou, Assistant Attorney General, for the State of Tennessee.

## OPINION

The issues in this appeal pertain to charitable, conditional gifts and whether the recipient of the conditional gifts is entitled to relief under the *cy pres* doctrine.

In 2005, Fisk University commenced this action by filing an *ex parte* Complaint for Declaratory Judgment, whereby the University sought permission to sell two valuable paintings from the Alfred Stieglitz Collection at Fisk University, *Radiator Building - Night, New York* by Georgia O'Keeffe (hereinafter "*Radiator Building*") and *Painting No. 3* by Marsden Hartley. The stated purpose of the proposed sale was to generate funds for the University's "business plan" to restore its endowment, improve its mathematics, biology, and business administration departments, and build a new science building. The art had been given to the University subject to certain conditions. One of the conditions was that none of the art given to the University would be sold or exchanged.

While the case was pending, the University's request for relief morphed into a request for the approval of a "settlement agreement" with the Georgia O'Keeffe Museum (hereinafter the "O'Keeffe Museum") to sell *Radiator Building* to the museum for $7,500,000. Before that request could be acted upon, a "settlement agreement" with the Crystal Bridges - Museum of American Art, Inc. of Benton, Arkansas (hereinafter "Crystal Bridges") was presented to the court whereby the University would sell a 50% undivided interest in the entire Collection for $30 million. Pursuant to the proposed agreement, the University and Crystal Bridges would each have the right to display the Collection at their respective facilities six months of each year. The trial court denied the University's request, finding the University was not entitled to relief under the *cy pres* doctrine. This appeal followed.

To start at the very beginning, we must look back to July 13, 1946. On that day, Alfred Stieglitz, a pioneering photographer, collector of American modern art, and husband of Georgia O'Keeffe, died. Mr. Stieglitz's estate included approximately 900 works of art, including a large number of photographs. Mr. Stieglitz's Last Will and Testament was admitted to probate in the Surrogate's Court of New York County, New York, on September 13, 1946, at which time his

widow, Georgia O'Keeffe, was appointed Executrix of the estate. Provisions relevant to these proceedings appeared in Articles SECOND and THIRD of the will. Article SECOND provided:

> My said wife shall also have the right, during her lifetime, to transfer said property or any part thereof, without receiving any consideration, to one or more corporations, such as are described in Article THIRD of this Will, and as she may select or cause to be incorporated.

Article THIRD stated that any of Mr. Stieglitz's photographs and art works not disposed of by Ms. O'Keeffe during her lifetime would be transferred to nonprofit corporations under arrangements allowing public access to promote the study of art. The provision read as follows:

> Upon the death of my wife . . . I give and bequeath so much of my entire collection of photographs (including those produced by me) and other works of art as shall not have been disposed of by my said wife to one or more corporations . . . such property to be received and held by such corporation or corporations under such arrangements as will assure to the public, under reasonable regulations, access thereto to promote the study of art, but no corporation shall be entitled to share in this bequest any part of whose net earnings shall inure to the benefit of any private stockholder or individual or any substantial part of whose activities shall be carrying on propaganda, or otherwise attempting to influence legislation.

In order to facilitate the transfer of art, the will authorized his executors to transfer cash and securities from his estate to the chosen nonprofit corporations to defray the expenses of managing and preserving the artworks.

At the time of his death, Mr. Stieglitz had a surviving daughter who was disabled. A special guardian appointed to represent the daughter during the probate of Mr. Stieglitz's estate raised an issue suggesting that the will could violate Section 17 of the Decedent's Estate Law, which prohibited a testator from making charitable gifts of a value greater than 50% of the entire estate if the testator was survived by a spouse or child.

To resolve the possible violation of Section 17, Ms. O'Keeffe petitioned the court seeking permission to donate all of Stieglitz's photographs and art work, pursuant to Article SECOND of the will, to six nonprofit institutions that met the conditions set forth in Article THIRD: the Metropolitan Museum of Art in New York, the Philadelphia Museum of Art, the National Gallery of Art in Washington, the Art Institute of Chicago, the Library of Congress, and Fisk University. These charitable donations would constitute less than 50% of the estate's value and, thus, would be within the limits of Section 17 and would dispose of Stieglitz's collection. Ms. O'Keeffe additionally waived her individual right to bequeath any remaining part of Mr. Stieglitz's estate to charity and, acting in her capacity as Executrix, she renounced the right of the Estate to do the same. The court granted Ms. O'Keeffe's petition ordering that "all of the photographs and other works of art be entirely transferred and delivered to the six charitable and educational institutions within thirty

(30) days." As directed by the Will, the remainder of Mr. Stieglitz's estate was conveyed to Ms. O'Keeffe as life tenant.

In a June 8, 1949 letter signed by Ms. O'Keeffe in her capacity as Executrix of the Stieglitz Estate, title to the respective pieces of the Stieglitz Collection were transferred to various charities, one of which was Fisk University. The June 8, 1949 letter to Fisk University President, Dr. Charles S. Johnson stated in pertinent part:

> Pursuant to the authorization given me as Executrix of the Last Will and Testament of Alfred Stieglitz, deceased, by the decision of the Surrogate's Court of New York County rendered May 19, 1949, I do hereby assign and transfer to Fisk University the various objects previously delivered to it from the Stieglitz Estate on permanent loan.
> . . . .
> It is my understanding that Fisk University will not at any time sell or exchange any of the objects in the Stieglitz Collection . . . and that it will lend The Gaboon Figure to the Museum of Modern Art every three years for a period of three months if requested to do so.

In a reply letter dated June 13, 1949, President Johnson acknowledged the formal assignment and transfer of the various objects and stated in pertinent part that "Fisk University will not at any time, sell or exchange any of the objects in the Stieglitz Collection."

In two earlier letters to President Johnson, Ms. O'Keeffe had set out various conditions for the artwork and photographs in the Collection, including the following:

- The artwork is to be designated as the Alfred Stieglitz Collection.
- No photographs in the Collection may be loaned to any other person or institution, and the other works may only be loaned for certain limited purposes.
- The photography mounting and matting may not be removed or changed.
- The Collection is to be exhibited intact and no other artwork is to be shown in the same room without Ms. O'Keeffe's consent.
- The Collection must be under surveillance at all times when the room is not locked.
- The Collection should be housed in as safe a building as possible.
- The walls are to be painted white or a very light color designated by Ms. O'Keeffe.

President Johnson responded to the various letters in writing, advising repeatedly that the University accepted all of the conditions.

The portion of the voluminous Stieglitz Collection that was gifted to the University, which totaled ninety-seven pieces, consisted of nineteen Stieglitz photographs and seventy-eight works of

art, including sculptural pieces, oil paintings, water colors, lithographs, and other works on paper.

In addition to the pieces gifted from the Stieglitz estate, Ms. O'Keeffe "loaned" to the University four paintings from her personal collection. The four paintings consisted of *Calla Lilies* and *In Vaudeville,* both of which were painted by Demuth, and *Radiator Building – Night, New York*, and *Flying Backbone*, both of which were paintings by Ms. O'Keeffe. These four pieces were provided to the University with instructions that they be hung and exhibited with the Stieglitz Collection and maintained as part of the Stieglitz Collection (hereinafter "the Collection"). The four pieces were originally provided to the University by Ms. O'Keeffe on "permanent loan," not as gifts. Over the next few years, while the University had possession of the loaned pieces, Ms. O'Keeffe made the decision to give each of the four pieces to the University, each of which President Johnson accepted on behalf of the University. The gift of *Calla Lilies* was formalized in writing and thus completed in 1949. The gift of *Radiator Building – Night, New York*, was completed in 1954. The gift of *In Vaudeville* and *Flying Backbone* was completed in 1956.

Ms. O'Keeffe died in 1986. In her Last Will and Testament, Ms. O'Keeffe left most of her estate to her assistant and long-time companion, John Hamilton. When the will was presented for probate, Ms. O'Keeffe's relatives, who were dissatisfied with the enormity of the bequests to Mr. Hamilton, filed a will contest. Following some contentious proceedings, the will contestants and Mr. Hamilton entered into a court-approved settlement. For purposes of these proceedings, the two most important components of the settlement were the formation of the Georgia O'Keeffe Foundation (the "Foundation")[1] and the designation of the Foundation as the residuary beneficiary of Georgia O'Keeffe's estate. As a result of the settlement, the Foundation received a large portion of Ms. O'Keeffe's estate as well as all residuary rights.

Shortly after the University filed its *ex parte* Complaint for Declaratory Judgment in 2005, the O'Keeffe Foundation sought permission to intervene on the basis it has standing to enforce the conditions as a matter of contract and that it had a right to the remedy of reverter. The trial court granted the Foundation permission to intervene and file an intervening petition. In its Intervening Petition, the Foundation opposed the sale of the paintings, sought to enforce the charitable conditions, and, alternatively, to recover the Collection due to the University's breach of material conditions of the gifts.

The Attorney General and Reporter of Tennessee also sought to intervene to represent the interests of the charitable beneficiaries, the potential charitable beneficiaries, and the people of Tennessee pursuant to the Charitable Beneficiaries Act of 1997, Tenn. Code Ann. § 35-13-110, and the Uniform Trust Code, Tenn. Code Ann. § 35-15-110. The Attorney General's initial motion to intervene was denied.[2]

---

[1] The Foundation was founded to perpetuate the artistic legacy of Georgia O'Keeffe and to be the residuary beneficiary of her estate.

[2] A subsequent petition to intervene was granted, which will be discussed later.

In March of 2006, the year after the O'Keeffe Foundation had intervened in this action, the O'Keeffe Foundation entered into an agreement with the Georgia O'Keeffe Museum[3] whereby the Foundation assigned all its assets, including its interest in this civil action, to the O'Keeffe Museum. Following the assignment of the Foundation's interest in this action to the O'Keeffe Museum, the Foundation filed a motion to substitute the Museum for the Foundation in this action. The motion to substitute was granted on May 9, 2006.

Thereafter, the University subsequently filed a motion for summary judgment seeking to dismiss the O'Keeffe Museum's counter-claims on the ground the Museum lacked standing because Ms. O'Keeffe had gifted the items owned by the Stieglitz estate in her capacity as Executrix of the estate. The trial court denied this motion in an order entered October 3, 2006, finding that Ms. O'Keeffe had acted in her capacity as a life tenant, not as Executrix of the Stieglitz estate.

In April 2007, the University filed a motion to amend its complaint to include a request for relief from the charitable conditions under the *cy pres* doctrine. Immediately thereafter, the Attorney General made its second attempt to intervene to represent the interests of the people of Tennessee. This time the trial court granted the Attorney General permission to intervene.

In May 2007, the O'Keeffe Museum filed a motion for summary judgment contending that the conditions on the gifts imposed by Ms. O'Keeffe were binding on the University, that the conditions prevented the sale of any of the pieces, that the University had violated the conditions, and, as a consequence, the entire Collection reverted to the Museum, as the successor in interest to Ms. O'Keeffe's estate.

The Attorney General opposed the Museum's motion for summary judgment contending that Ms. O'Keeffe's rights and interests in her late husband's collection expired at her death. On this basis the Attorney General also disputed the Museum's standing. The Attorney General further opposed the Museum's claim of reversion, contending reversion was not appropriate or necessary because the conditions imposed on the charitable gifts could be modified under the *cy pres* doctrine.

The trial court issued a Memorandum and Order on June 12, 2007, wherein the court found that the conditions prevented the sale of any pieces in the Collection, the University was not entitled to relief pursuant to the *cy pres* doctrine and, accordingly, "the Court should by summary judgment dismiss the University's lawsuit and enjoin the University from selling the Collection." The foregoing ruling, however, did not dispose of all the claims asserted by the parties, including the O'Keeffe Museum's counter-claim for reversion based on the University's alleged breach of the conditions. The O'Keeffe Museum's counter-claim for reversion was set for trial on September 18, 2007; however, before it came on for trial, the O'Keeffe Museum and the University entered into a "settlement agreement" for which they jointly sought court approval. The agreement provided that the O'Keeffe Museum would purchase the painting *Radiator Building* for $7,500,000. The

---

[3] The O'Keeffe Museum was organized in 1997 and the Museum operated independent of the Foundation prior to 2006.

agreement also provided that the Museum would make the painting available on loan to the University for four months every four years, upon the University's reasonable request, and that the Museum would provide a reproduction of the painting to the University for permanent display. The O'Keeffe Museum also agreed that it would not oppose the University's future efforts to sell *Painting No. 3*.

The Attorney General objected to the proposed settlement agreement with the O'Keeffe Museum contending it was not in the best interest of the people of Tennessee. Following a hearing on the proposed settlement, the trial court denied the proposed settlement agreement in an order entered on September 10, 2007, stating the agreement with the O'Keeffe Museum was not consistent with the conditions imposed by Ms. O'Keeffe. The trial court also stated in the same order that the University should consider other potential offers, including a recent proposal from the Crystal Bridges Museum of Benton, Arkansas.

Soon thereafter, the University reached an agreement with the Crystal Bridges Museum and on September 28, 2007, filed a motion seeking permission to amend its Complaint to present the proposed settlement agreement with the Crystal Bridges Museum and to request the requisite *cy pres* relief needed to enter into that agreement. The trial court granted the motion to amend the complaint on October 22, 2007. On November 9, 2007, the O'Keeffe Museum filed an Answer to the University's Amended Complaint that included a counter-claim for reversion.

The University then filed a motion for partial summary judgment challenging the O'Keeffe Museum's standing and its claim of reversion. The Attorney General filed a response agreeing that the O'Keeffe Museum lacked standing and that reversion was unavailable as none of the documents executed by Georgia O'Keeffe expressly provided for reversion. Following a hearing on the motion, the trial court determined that the O'Keeffe Museum had standing as the successor in interest to Georgia O'Keeffe's estate, and the court also found there was an implied reversionary interest.

The O'Keeffe Museum then filed a motion for summary judgment challenging the University's request for *cy pres* relief. In the order granting the motion for summary judgment, the trial court held that the University failed to establish two of the essential elements of the *cy pres* doctrine: (1) that the gifts to the University were motivated by a general charitable intent and (2) the relief sought was not as near as possible to effectuating the purpose of the charitable gift.

Thereafter, a trial was held on the sole remaining claim, the O'Keeffe Museum's counter-claim for breach of the conditions imposed on the charitable gifts and for reversion. On March 6, 2008, the trial court entered a Memorandum and Order finding that the O'Keeffe Museum had failed to prove that the University violated the conditions, with the exception that the University had breached the conditions when it declared it could not care for and display the Collection. But, the court found this breach insufficient to justify reversion – that "the circumstance did not yet justify removing the Collection" from the University – and, therefore, dismissed the O'Keeffe Museum's counter-claims. The trial court did, however, issue a permanent mandatory injunction preventing the University from selling the Collection and set a deadline for the University to again display the

Collection, which had been in storage due to major renovations to the Gallery. The trial court also admonished the University for its failure to inform the court of the conditions imposed on the charitable gifts at the commencement of the *ex parte* action and for its failure to inform the court of substantive changes in the University's financial condition, both of which the trial court found to be germane to the issues. This appeal followed.

## ANALYSIS

The trial court ruled, and all parties are in agreement, that New York law controls the substantive issues in this case. But, in matters involving procedure, the law of the forum state, Tennessee, applies. Therefore, our analysis will be in accordance with the applicable laws.

## STANDING

Under New York and Tennessee law, a party must have a concrete interest, a legal stake in the matter being adjudicated, to have standing, and without standing that party is precluded from adjudicating an action. *See Silver v. Pataki*, 755 N.E.2d 842, 847 (N.Y. 2001) ("[t]he existence of an injury in fact – an actual legal stake in the matter being adjudicated – ensures that the party seeking review has some concrete interest in prosecuting the action which casts the dispute in a form traditionally capable of judicial resolution"); *see also ACLU v. Darnell*, 195 S.W.3d 612, 619 (Tenn. 2006) ("the doctrine of standing precludes courts from adjudicating an action at the instance of one whose rights have not been invaded or infringed").

New York's standing doctrine requires a litigant to show "injury." *See Silver*, 96 N.Y.2d at 847; *Soc'y of Plastics Indus, Inc. v. County of Suffolk*, 573 N.E.2d 1034, 1040-41 (N.Y. 1991). Similarly, under Tennessee law, a claimant must show three elements to establish standing: (1) a distinct and palpable injury, as opposed to a conjectural or hypothetical injury; (2) a causal connection between the claimed injury and the challenged conduct; and (3) the alleged injury is capable of being redressed by a favorable decision of the courts. *Lynch v. City of Jellico*, 205 S.W.3d 384, 395 (Tenn. 2006).

The trial court found that the O'Keeffe Museum has an implied "right of reversion" in the Collection and upon that basis has standing. Without a right of reversion, the O'Keeffe Museum has no standing to be a party to this action. Accordingly, our analysis begins with a determination of whether the Georgia O'Keeffe Museum has a right of reversion.

## THE RIGHT OF REVERSION

The O'Keeffe Foundation was the residuary beneficiary of the Georgia O'Keeffe estate. Pursuant to a 1997 agreement with the O'Keeffe Museum, the Foundation transferred all rights it had as the residuary beneficiary of Georgia O'Keeffe's estate to the O'Keeffe Museum, including specifically any rights Georgia O'Keeffe retained in the Collection gifted to the University. It is

upon this chain of title that the O'Keeffe Museum claims it possesses the rights Ms. O'Keeffe retained in the Collection she transferred to the University, including the right of reversion.

Four of the 101 pieces gifted to the University were personally owned by Georgia O'Keeffe. Thus, these four pieces were not part of the gift of the ninety-seven pieces formerly owned by Mr. Stieglitz and the Stieglitz estate. The ninety-seven pieces were given to the University at the direction of Ms. O'Keeffe pursuant to rights bestowed upon her under the will of Mr. Stieglitz.[4] Accordingly, we must separately examine the two sets of gifts to determine whether the O'Keeffe Museum has standing to participate in this action as to all, some, or none of the pieces gifted to the University in the 1950s and 1960s.

THE NINETY-SEVEN PIECES FROM ALFRED STIEGLITZ'S ESTATE

The majority of the Collection at issue was owned by Mr. Stieglitz and passed pursuant to his will. In his will, Mr. Stieglitz bequeathed to his wife, Georgia O'Keeffe "all my real and personal property, *for the duration of her life*." (Emphasis added). It is undisputed that the language constituted a bequest to Georgia O'Keeffe of a life estate in Mr. Stieglitz's entire collection.

Under New York law, a life estate, and all the rights associated with it, terminates upon the death of the donee. *See In re Estate of Carey*, 672 N.Y.S.2d 131, 133 (N.Y. App. Div. 1998) ("The real substance of a life estate consists in the life tenant's right to exclude all others from the possession of the subject property for the duration of his or her own life. In general terms, such an estate, by its very nature, terminates upon the death of the life tenant, although it may terminate earlier by forfeiture or by voluntary surrender.") (internal citations omitted). Ms. O'Keeffe was the donee of a life estate in her husband's collection. As a result, any rights Georgia O'Keeffe possessed as the life tenant in her husband's collection terminated at her death. Accordingly, the mere fact Georgia O'Keeffe had a life estate in the ninety-seven pieces at issue cannot constitute the basis for the Museum's claim of a right of reversion in the Collection. *See In re Moeller's Estate*, 39 N.Y.S.2d 180, 184-85 (N.Y. Sur. Ct. 1942).

Mr. Stieglitz's will also bequeathed to Georgia O'Keeffe the right "during her lifetime, to transfer said property, or any part thereof, without receiving any consideration, to one or more corporations, such as are described in Article THIRD of this Will, and as she may select or cause to be incorporated."[5] This provision gave Ms. O'Keeffe the power, if exercised during her lifetime, to

---

[4] Ms. O'Keeffe either conveyed the ninety-seven pieces from Alfred Stieglitz's estate in her capacity as "the life tenant" of the pieces or as the possessor of a specific power of appointment under his will with the power to make a gift of the pieces, a discussion of which occurs later in this opinion.

[5] Article THIRD provides that "[u]pon the death of my wife . . . I give and bequeath so much of my entire collection of photographs (including those produced by me) and other works of art as shall not have been disposed of by my said wife to one or more corporations . . . such property to be received and held by such corporation or corporations under such arrangements as will assure to the public, under reasonable regulations, access thereto to

(continued...)

designate the beneficiaries of her husband's collection. Under New York law, such a power of appointment is defined as "an authority created or reserved by a person having property subject to his disposition, enabling the donee to designate, within such limits as may be prescribed by the donor, the appointees of the property or the shares or the manner in which such property shall be received." N.Y. Est. Powers & Trusts Law § 10-3.1(a). "A power of appointment is general to the extent that it is exercisable wholly in favor of the donee, his estate, his creditors or the creditors of his estate," and all powers of appointment that are not general are special. N.Y. Est. Powers & Trusts Law § 10-3.2(b)-(c). In the present case, Georgia O'Keeffe was only given the power to transfer property to "one or more corporations, such as described in Article Third." Therefore, her power was not a general power, but rather Ms. O'Keeffe's power of appointment was a special or limited power.

To effectively exercise a power of appointment under New York law, it is sufficient for the donee to manifest her intention to exercise the power in writing, but the donee does not have to expressly reference such power. The statute expressly provides that such a manifestation exists when the donee:

> (1) Declares in substance that she is exercising all the powers [she] has;
>
> (2) Sufficiently identifying the appointive property or any part thereof, executes an instrument purporting to dispose of such property or part;
>
> (3) Makes a disposition which, when read with reference to the property [she] owned and the circumstances existing at the time of its making, manifests [her] understanding that [she] was disposing of the appointive property; or
>
> (4) Leaves a will disposing of all of her property or all of [her] property of the kind covered by the power, unless the intention that the will is not to operate as an execution of the power appears expressly or by necessary implication.

N.Y. Est. Powers & Trusts Law § 10-6.1(a).

The record in this case establishes that Ms. O'Keeffe fully exercised her special power of appointment when she transferred her late husband's entire collection to six different nonprofit institutions pursuant to the court-approved petition. On April 13, 1948, Ms. O'Keeffe filed a petition that stated the following:

> That petitioner, as the life tenant of all of the testator's property, real and personal, under Article "SECOND" of decedent's last will and testament, is desirous of exercising the right given to her in the third paragraph of said Article "SECOND" to

---

[5](...continued)
promote the study of art . . . ."

transfer, to the following corporations, without consideration therefor, all of the decedent's photographs and works of art . . . .

In June 1949, the surrogate's court granted the petition and directed that "all of such photographs and other works of art [in the Stieglitz estate] be entirely transferred and delivered to the said charitable and educational institutions within thirty (30) days from the date of this decree." The court further ruled that

> the delivery of the decedent's complete collection of art works pursuant hereto, will render inoperative the provisions of the Last Will and Testament of Alfred Stieglitz, deceased, for the delivery of such works of art, cash and securities by the executors subsequent to the death of the widow of said testator, the petitioner herein, and it further appearing that the petitioner, by written instrument executed and acknowledged by her on the 18th day of November, 1948, and filed herein, having irrevocably and forever renounced, relinquished, released and surrendered absolutely the right or power, given her by Article SECOND of the said Last Will and Testament, to transfer any moneys or property of the estate without consideration therefor, other than as authorized and directed by this decree.

Based on Georgia O'Keeffe's petition and the court's order that followed, we find that Ms. O'Keeffe affirmatively declared that she was exercising the special power of appointment granted to her in Mr. Stieglitz's will to dispose of his art collection, and that her exercise of that power of appointment was recognized by the surrogate's court. Further, Ms. O'Keeffe "irrevocably and forever renounced, relinquished, released and surrendered absolutely the right of power . . . to transfer any money or property" of Mr. Stieglitz's estate other than as authorized and directed by the surrogate court's decree. As for the surrogate court's decree, we find it significant that the court ordered "the entire collection" be transferred and delivered to the six identified charitable and educational institutions, one of which was Fisk University.[6]

Ms. O'Keeffe expressly renounced and released her power of appointment and, thus, she did *not* retain a right of reversion in the Stieglitz Collection. This fact was acknowledged by the surrogate's court in the 1949 order. No right of reversion survived renouncement and release of her power of appointment; therefore, the O'Keeffe Museum did not inherit as the residuary beneficiary of Ms. O'Keeffe's estate any rights or interests arising under the power of appointment. Moreover, Ms. O'Keeffe's power of appointment merely allowed her to transfer her late husbands's collection to nonprofit corporations to promote the study of art; it did not entitle her to retain any rights for herself or her estate. Any attempt by Ms. O'Keeffe to create or retain such a right would have been

_____

[6] N.Y. Est. Powers & Trusts Law § 10-9.2 provides that a power of appointment is releasable in writing, signed by the donee of such power, and delivered to the clerk of the surrogate's court having jurisdiction of the estate of the donor.

invalid as the special power of appointment did not include such a right. *See In re Bennett's Estate*, 297 N.Y.S. 396, 399-401 (N.Y. App. Div. 1937).

Under the two relevant provisions of Mr. Stieglitz's will, Ms. O'Keeffe had a life estate in the collection and she possessed a special power of appointment that allowed her to transfer his collection to nonprofit corporations. Neither the life estate nor the special power of appointment survived her death. Accordingly, the O'Keeffe Museum has no right of reversion and, therefore, no standing as it pertains to the ninety-seven pieces that came from Mr. Stieglitz's estate.

THE FOUR PIECES OWNED BY GEORGIA O'KEEFFE

We must now examine whether the Georgia O'Keeffe Museum has standing regarding the four pieces of art that were part of Ms. O'Keeffe's personal art collection.

The four paintings separately owned by Ms. O'Keeffe were not initially given or gifted to the University by Ms. O'Keeffe. To the contrary, when Ms. O'Keeffe made the gift of the ninety-seven pieces from her husband's estate, she merely *loaned* her four pieces to the University. Specifically, when the four pieces were delivered to the University in June 1949, they were officially "on permanent loan" to the University; thereafter, Ms. O'Keeffe made a gift of the four pieces to the University.

The elements necessary to constitute a valid gift are well-settled under New York law. *E.g. In re Spain's Estate*, 46 N.Y.S.2d 789, 790 (N.Y. Sur. Ct. 1944)*; In re Fitzpatrick's Estate*, 17 N.Y.S.2d 280, 289 (N.Y. Sur. Ct. 1940). A valid *inter vivos* gift requires intent, delivery, and acceptance. *In re Spain's Estate*, 46 N.Y.S.2d at 790; *In re Peno's Estate*, 221 N.Y.S. 205, 217 (N.Y. Sur. Ct. 1927). "There must be an intent to make an immediate gift, a delivery of the thing given and an acceptance of the gift." *In re Peno's Estate*, 221 N.Y.S. at 217. Further, "[t]he delivery must be such as to vest the donees with the control and dominion of the property, to divest, absolutely, the donor of his dominion and control, and it must be made with the intent to vest the title to the property in the donee." *In re Fitzpatrick's Estate*, 17 N.Y.S.2d at 289.

The gifting of these four pieces is evidenced by a series of letters and telegrams exchanged between Ms. O'Keeffe and President Johnson between 1949 and 1955 and Ms. O'Keeffe's personal tax returns for 1949 and 1956. The first gift is evidence by a letter dated December 27, 1949, from Ms. O'Keeffe to President Johnson, wherein she stated: "I should like to make a gift to Fisk University of my painting by Charles Demuth, 'Calla Lillies', which I have placed at Fisk on loan." President Johnson formally accepted the gift in a letter by responding that "[y]our decision to make a gift to Fisk University of the painting "Calla Lillies" by Charles Demuth pleases us greatly. . . ." Thereafter, in January 1955, Ms. O'Keeffe sent a Western Union telegram to President Johnson that asked, "Can Fisk accept my painting you have on permanent loan "Radiator Building Night N.Y. 27"

-12-

as a [19]54 gift?"[7] President Johnson wrote back that "Fisk University is pleased to accept your painting, Radiator Building, Night, as a 1954 gift to the Art Gallery of this institution." While there is no correspondence in the record concerning the other two paintings, *In Vaudeville* and *Flying Backbone*, Ms. O'Keeffe's tax returns reveal that she also made a gift of these two paintings to the University in the tax year 1956.

Ms. O'Keeffe's letters, which are the gift instruments, made no reference to a right of reversion or that Ms. O'Keeffe or her estate could revoke the gifts of her four pieces for any reason. Similarly, other correspondence between Ms. O'Keeffe and Dr. Johnson found in the record shows no evidence of an intent to maintain a right to revoke her gift of the four paintings or to make the gifts conditional. Although there are no direct or implied references to a right of reversion or revocation, Ms. O'Keeffe did express frustration with the University's failure to properly maintain the Collection on more than one occasion.

In 1951, a year after she gifted *Calla Lillies* to the University, and before she gifted the other three paintings, Ms. O'Keeffe wrote to President Johnson admonishing him for the University's removal of part of the collection. She again wrote President Johnson stating that the University did not appear to have anyone to properly care for the Collection and asked, "Would you like to *consider* letting me withdraw the Collection?" (Emphasis added). She ended the letter with the following statement: "In the meantime, if you find the Collection too much of a problem and wish to consider giving it up, let me know so that I can plan what to do with it next." President Johnson responded indicating that the University wanted to maintain the collection and assured Ms. O'Keeffe that the proper measures would be employed to maintain and preserve the Collection. Although Ms. O'Keeffe occasionally expressed concern, if not frustration, with the University's care and use of the Collection, at no time did Ms. O'Keeffe assert that she had a right of reversion and at no time did she make a demand for the return of any of the four pieces she gifted to the University.

The foregoing correspondence reveals that Ms. O'Keeffe expected the University to properly maintain and exhibit the Collection; however, there is no indication in the correspondence that Ms. O'Keeffe expressly retained a right of reversion in herself or her estate. To the contrary, although occasionally frustrated with the University, Ms. O'Keeffe gifted three additional paintings that had been on permanent loan *after* she became aware of some deficiencies in the maintenance of the Collection. Therefore, there is no evidence in the record from which to make a finding that Ms. O'Keeffe intended to retain a reversionary interest in any of the four pieces she gifted to the University between 1949 and 1956.

We have determined as a matter of law that the O'Keeffe Museum has no reversionary interest in the ninety-seven pieces from the Stieglitz Estate and no reversionary interest in the four pieces formerly owned by Georgia O'Keeffe; therefore, the O'Keeffe Museum has no standing to participate as a party in this action. Because it does not have standing, the O'Keeffe Museum's intervening petitions and counter-claims must be dismissed for lack of standing and the court's

---

[7]This appears to have been a belated effort to obtain a tax deduction for the year 1954.

orders granting relief in accordance therewith must be vacated, including without limitation the court's order entered March 6, 2008.[8]

The dismissal of the O'Keeffe Museum leaves only two parties, the University and the Attorney General and Reporter of Tennessee. We will therefore examine the University's prayer for relief and the objections asserted by the Attorney General.

## THE UNIVERSITY'S PRAYER FOR *CY PRES* RELIEF FROM THE CONDITIONS

In its Amended Petition, the University sought relief, pursuant to the *cy pres* doctrine, from certain conditions imposed on the University when the Collection was gifted. The reasons for the requested relief are the University's bleak financial circumstance, which the University contends jeopardize its viability and make it "impractical to comply with the literal terms" of the gifts, along with other material changes in circumstances that have occurred in the more than fifty years since the conditional gifts were made.

The University's petition for *cy pres* relief was dismissed upon the finding that the University could not prove some of the essential elements necessary to be entitled to *cy pres* relief. For reasons we explain in detail below, we have determined the trial court erred in concluding that the University could not establish that it was entitled to *cy pres* relief based upon the court's finding that Ms. O'Keeffe's charitable intent was specific, not general. Whether *cy pres* relief is available, and if so, in what fashion and to what extent, will have to be decided by the trial court on remand.[9]

## THE *CY PRES* DOCTRINE

New York law, which the parties agree applies to this issue, requires that a donee of a charitable gift with conditions must obtain court approval of changes in conditions placed on charitable gifts if the donor is no longer living. This type of relief is known as *cy pres* relief. The

---

[8] In the March 6, 2008 order, the trial court found that the University had breached the conditions but that "the circumstance did not *yet* justify removing the Collection" from the University. (Emphasis added). The court further, *inter alia*, imposed a permanent mandatory injunction preventing the University from selling the Collection and set a deadline for the University to again display the Collection. The trial court also justifiably admonished the University for its failure to inform the court of the conditions imposed on the charitable gifts at the commencement of the *ex parte* action and for its failure to inform the court of substantive changes in the University's financial condition, both of which the trial court correctly found to be germane to the issues. As a consequence of the rulings in this opinion, we do not believe the extraordinary remedies in the mandatory injunction imposed in March 6, 2008 are necessary. However, if circumstances change that justify the imposition of an injunction, the trial court has the discretion to impose injunctive relief as it deems appropriate.

[9] The University's *cy pres* petition was dismissed upon the motion of the O'Keeffe Museum for summary judgment. We have dismissed the O'Keeffe Museum as a party because it lacks standing. Therefore, the O'Keeffe Museum's motion for summary judgment must be stricken as well as the resulting order whereby the University's request for *cy pres* relief was dismissed. In the interest of judicial economy we find it appropriate to address the trial court's analysis of the University's petition for *cy pres* relief as it will be at issue on remand.

phrase "*cy pres*" is Anglo-French in origin and literally means "as near as possible."[10] *In re Catholic Child Care Soc'y of Diocese of Brooklyn*, No. 3522/1968, 2009 WL 1194970, at *1 (N.Y. Sur. Ct. Apr. 30, 2009). "The doctrine proceeds upon the principle that it is the duty of the court to give effect to the general charitable intention of the testator as nearly as possible, when the subsidiary intent that a gift take effect in a particular manner is impossible to implement." *Id.*

The *cy pres* doctrine, and thus the ability of the court to allow a donee to deviate from the conditions attached to a charitable gift, is neither novel nor new. The doctrine was first codified in New York law by the enactment of the Tilden Act in 1893.[11] *See In re Proceeding of Biondo*, No. 335060, 2006 WL 687757, at *1 (N.Y. Sur. Ct. Mar. 16, 2007). The *cy pres* doctrine, as presently codified, states in pertinent part,

> whenever it appears to such court that circumstances have so changed since the execution of an instrument making a disposition for religious, charitable, educational or benevolent purposes as to render impracticable or impossible a literal compliance with the terms of such disposition, the court may, on application of the trustee or of the person having custody of the property subject to the disposition and on such notice as the court may direct, make an order or decree directing that such disposition be administered and applied in such manner as in the judgment of the court will most effectively accomplish its general purposes, free from any specific restriction, limitation or direction contained therein . . . .

N.Y. Est. Powers & Trusts Law § 8-1.1(c).

A donee's request for *cy pres* relief is a two-step process. First, the donee must establish that *cy pres* relief is available. New York courts have developed a three-pronged test for determining whether *cy pres* relief is available. *In re Hummel,* 805 N.Y.S.2d 236, 248-49 (N.Y. Sup. Ct. 2005) One, the gift must have been charitable in nature. *Id.* Two, the donor must have demonstrated a general, rather than a specific, charitable intent. *Id.* Three, the circumstances have changed subsequent to the gift that render literal compliance with the restriction impossible or impracticable. *Id.* If the donee proves each prong of the three-pronged test stated above, then *cy pres* relief is available; however, that determination does not satisfy the last requirement of the *cy pres* doctrine, which is that the proposed modification most closely approximates the donor's charitable intent. *See* N.Y. Est. Powers & Trusts Law § 8-1.1(c)*; In re Polytechnic Univ.*, 812 N.Y.S.2d 304, 422 (N.Y. Sur. Ct. Mar. 16, 2006). Accordingly, we need not consider whether the proposed agreement with the Crystal Bridges Museum is or is not as near as possible to the intent expressed by Georgia

---

[10] It is further explained that the phrase "*cy pres*" when expanded to its full implication is "*cy pres comme possible*," which means "as near as possible." Ronald Chester et al., *The Law of Trusts and Trustees* § 431 (3d. ed. 2005).

[11] Tennessee's version of the *cy pres* doctrine, which is consistent with the New York doctrine, is codified at Tenn. Code Ann. § 35-15-413.

O'Keeffe until it is determined that the University has successfully proven all three prongs under the New York *cy pres* test. *See In re Hummel,* 805 N.Y.S.2d at 248-49.

In this case, it is undisputed that the gifts to the University were charitable in nature, thus satisfying the first essential element of the *cy pres* analysis. We will, therefore, proceed to the second prong of the *cy pres* analysis to determine whether Ms. O'Keeffe demonstrated a general, rather than a specific, charitable intent when the Collection, including her four pieces, were given to the University.

### MS. O'KEEFFE'S CHARITABLE INTENT - SPECIFIC OR GENERAL?

The University must establish, *inter alia*, that Alfred Stieglitz and/or Ms. O'Keeffe were motivated by a general charitable intent when the Collection was given to the University in the 1950s.[12] *See In re Estate of Othmer*, 710 N.Y.S.2d 848, 850-851 (N.Y. Sur. 2000). The courts generally favor a finding of general charitable intent, *see In re Kraetzer's Will*, 462 N.Y.S.2d 1009, 1013 (N.Y. Sur. Ct. 1983); *In re Goehringer's Will*, 329 N.Y.S.2d 516, 521 (N.Y. Sur. Ct.1972), and "*absent an express divesting condition*, *cy pres* is almost invariably applied." *In re Kraetzer's Will*, 462 N.Y.S.2d at 1013 (holding that courts are loathe to fail to find general intent) (emphasis added).

A donor's charitable intent may be evidenced in several ways. First, a donor's general charitable intent may be evidenced by other charitable gifts and the provisions of the gift. *In re Catholic Child Care Soc'y of Diocese of Brooklyn*, 2009 WL 1194970, at *1 (citing 18 N.Y. Jur.2d pg. 260); *In re Polytechnic Univ.*, 812 N.Y.S.2d 304, 310 (N.Y. Sur. Ct. 2006); *In re Hummel*, 805 N.Y.S.2d at 249. Similarly, the fact that a donor made similar charitable gifts to several different charities also demonstrates "a general charitable intent." *In re Estate of Othmer,* 815 N.Y.S.2d 444, 447 (N.Y. Sur. Ct. 2006); *In re Polytechnic Univ.*, 812 N.Y.S.2d at 310; *In re Hummel*, 805 N.Y.S.2d at 249. Finally, *the absence of a divesting clause* in the event of the conditions being breached is indicative of a general charitable intent. *In re Estate of Othmer,* 815 N.Y.S.2d at 447; *In re Polytechnic Univ.*, 812 N.Y.S.2d at 310; *In re Hummel*, 805 N.Y.S.2d at 249.

It is apparent from Alfred Stieglitz's will, the 1948 Petition Georgia O'Keeffe filed in the surrogate's court, and Ms. O'Keeffe's letters to President Johnson that followed, that the charitable intent motivating the gifts of the Stieglitz Collection and Ms. O'Keeffe's four pieces to the University was to make the Collection available to the public in *Nashville* and *the South* for the benefit of those who did not have access to comparable collections to promote the general study of

---

[12] The trial court stated that this was an elusive issue; we fully agree with the trial court in its characterization of the elusive nature of differentiating between general and specific charitable intent. We also note that we are not alone in this view. There is a trend toward replacing the requirement of "general intent." *See, e.g.,* Restatement (Third) of Trusts § 67 (2003). The trend is toward replacing the "general intent" requirement with a less elusive prerequisite that "unless the terms of the trust provide otherwise . . . ." *Id*. Further, "[m]uch criticism has focused on the artificial and speculative inquiry whether a settlor had a 'general' charitable intent and on the reality that, with the passage of time, courts are and rightly have been increasingly unlikely to find that intention lacking." Restatement (Third) of Trusts § 67 rep. n.b (2003).

art. The express language used in Alfred Stieglitz's will reveals that he desired his collection be donated to institutions *to promote the study of art*. The record in this case also reveals that Georgia O'Keeffe not only affirmed his expressed intent when making the gifts from his vast collection to the University and other institutions, but she also adopted her husband's charitable intent when she donated four pieces from her personal collection to the University.

In her correspondence to President Johnson, before and after the completion of the gifts from her collection, Ms. O'Keeffe expressed her intent that the Collection, *inter alia,* be identified as the Stieglitz Collection (including her four pieces) and preserved, intact, for its *educational study and historical value to the public*. Considering the facts in the record, we have concluded that the clear intent for giving the Collection to the University was to enable the public – in Nashville and the South – to have the opportunity to study the Collection in order to promote the general study of art.

We acknowledge the fact that Ms. O'Keeffe had a specific *purpose* in mind and that she imposed specific *conditions* on the gifts, but a specific purpose and the imposition of specific conditions does not mean that the gifts were motivated by a specific *intent*, as that term is applied in a *cy pres* analysis. *See, e.g., In re Estate of Othmer*, 815 N.Y.S.2d at 447. Thus, the fact that Ms. O'Keeffe had a specific purpose and imposed specific conditions does not alter the fact that the motivation for the gifts to the University was to promote the study of art in Nashville and the South.

We also find it significant that Ms. O'Keeffe made similar charitable gifts to several different charities at the same time the gifts were made to the University. This is significant, as New York law instructs, because it demonstrates "a general charitable intent." *In re Estate of Othmer,* 815 N.Y.S.2d at 447; *In re Polytechnic Univ.*, 812 N.Y.S.2d at 310; *In re Hummel*, 805 N.Y.S.2d at 249.

It is also significant that an "express divesting condition" cannot be found in the record. This is significant because the donee of a charitable conditional gift is "almost invariably" eligible for *cy pres* relief, assuming the other conditions are met, if there is no express divesting condition associated with the charitable gift. *In re Kraetzer's Will*, 462 N.Y.S.2d at 1013 (emphasis added). There is no express divesting clause in any of the correspondence between Ms. O'Keeffe and President Johnson prior to or at the completion of the respective gifts to the University.[13] For that matter, there is no express divesting provision in any of the relevant correspondence or court documents after the completion of the gifts. After the gifting of the Stieglitz Collection was completed and while Ms. O'Keeffe's four pieces were still on "permanent loan," Ms. O'Keeffe corresponded with President Johnson expressing "requests" and "recommendations" for the return of the Collection if the conditions of the gift could not be met; however, none of her requests or recommendations constitute a declaration of a "legal right" arising out of a divesting provision. Ms. O'Keeffe's correspondence merely constituted expressions of disappointment and frustration with

---

[13] To be binding, conditions on a charitable gift must have been imposed prior to or at the time of the completion of the gift; not thereafter. *See Phillippsen v. Emigrant Indus. Sav. Bank*, 86 N.Y.S.2d 133, 136-37 (N.Y. Sup. Ct. 1948) (stating that a completed *inter vivos* gift occurs when the donor intends to make a gift that will divest the owner of possession and dominion over the thing given and makes "a delivery of the subject of the gift in consummation of the intention.")

the manner in which the University was maintaining, or not appropriately maintaining, the Collection.[14]  Moreover, the subsequent correspondence could not alter the terms or conditions of the gift of the Alfred Stieglitz collection. *See Phillippsen v. Emigrant Indus. Sav. Bank*, 86 N.Y.S.2d 133, 136-37 (N.Y. Sup. Ct. 1948).  The disappointment expressed in Ms. O'Keeffe's correspondence with President Johnson in 1951 provided more than reasonable justification for Ms. O'Keeffe to include an express divesting clause in the subsequent gifts of her four pieces to the University; but she did not include an express divesting clause as a condition of her separate gifts and the absence of such a clause indicates that Ms. O'Keeffe did not intend for her gifts to revert to her or her estate in the event of a material breach.  Based upon these facts, we find no factual basis upon which to conclude that the conditional, charitable gifts contained an express divesting clause.  Accordingly, we have concluded there is no basis for a reversion of any of the gifts in the event of a material breach by the University.

Considering the foregoing facts, including the express purpose of promoting the study of art by the public in Nashville and the South, that Ms. O'Keeffe made similar charitable gifts to several different charities when the gifts were made to the University, that there is no express divesting clause, and the legal principle that the courts favor finding a general charitable intent, *see In re Kraetzer's Will*, 462 N.Y.S.2d at 1013; *see also In re Goehringer's Will*, 329 N.Y.S.2d at 520, we have concluded that the gifts of the Collection to the University were motivated by a general charitable intent. *See In re Estate of Othmer,* 815 N.Y.S.2d at 447; *In re Polytechnic Univ.*, 812 N.Y.S.2d at 310; *In re Hummel*, 805 N.Y.S.2d at 249.

Accordingly, we respectfully reverse the trial court's finding that the gifts were motivated by a specific charitable intent and the trial court's dismissal of the University petition for *cy pres* relief.

IS *CY PRES* RELIEF AVAILABLE TO THE UNIVERSITY?

Although we have reversed the trial court's summary dismissal of the University's petition for *cy pres* relief, we have not determined that *cy pres* relief is available to the University.  It is premature to determine what *cy pres* relief, if any, the University may be entitled to receive based on the unique facts of this case because the University has not yet established all three prongs of the New York *cy pres* analysis. *See In re Hummel,* 805 N.Y.S.2d at 249 (holding that a donee's request for *cy pres* relief is a two-step process; the first of which is the donee must establish that *cy pres* relief is available by proving all three prongs of the three-pronged analysis); *see also In re*

---

[14]In her letter to President Johnson dated July 14, 1951, Ms. O'Keeffe stated; "Would you like to consider letting me withdraw the Collection?"  The reason for her request to "withdraw" the Collection was made apparent by the paragraph in the letter that followed:

> You do not seem to have anyone to take care of it or utilize it and you have written me nothing about air-conditioning or controlling dust and humidity.  I saw the amount of dirt that settles down on a table top in the rooms over night, and with your humidity and changes of temperature it will soon be the ruination of the pictures. May I hear from you about this?

*Polytechnic Univ.*, 812 N.Y.S.2d at 310-11. At this stage of the proceedings, the University has not established whether the change of circumstances subsequent to the gift render literal compliance with the conditions impossible or impracticable. *See In re Hummel,* 805 N.Y.S.2d at 249; *see also* N.Y. Est. Powers & Trusts Law § 8-1.1(c)*; In re Polytechnic Univ.*, 812 N.Y.S.2d at 310-11 (stating if the donee proves each prong of the three-pronged test, then *cy pres* relief is available and the final determination to be made is whether the proposed modification most closely approximates the donor's charitable intent).

Accordingly, a determination of whether any form of *cy pres* relief is available must be held in abeyance unless and until the trial court, on remand, finds that literal compliance with the conditions imposed by Ms. O'Keeffe are impossible or impracticable. If *cy pres* relief is available to the University, then the trial court is to fashion a form of relief that most closely approximates Ms. O'Keeffe's charitable intent. *See* N.Y. Est. Powers & Trusts Law § 8-1.1(c); *see also In re Polytechnic Univ.*, 812 N.Y.S.2d at 311.

### IN CONCLUSION

We reverse the trial court's finding that the Georgia O'Keeffe Museum has standing. We also reverse the trial court's finding that the gifts to the University were motivated by a specific charitable intent instead of a general charitable intent, the finding that the University cannot establish that it is entitled to *cy pres* relief, and the order dismissing the Amended Petition of the University for *cy pres* relief. In furtherance of our decisions, we remand with instructions to strike all pleadings and motions filed by the O'Keeffe Museum, and its predecessor in interest the O'Keeffe Foundation, to dismiss the O'Keeffe Museum as a part to this action, to vacate all judgments entered in furtherance of the relief sought by the O'Keeffe Museum, including, without limitation, the trial court's order entered March 6, 2008, and for further proceedings consistent with this opinion. Costs of appeal are assessed against the Georgia O'Keeffe Museum.

_____
FRANK G. CLEMENT, JR., JUDGE